Filed 8/28/13  P. v. Easter CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>BRIAN DEMETRIUS EASTER et al.,<br><br>    Defendants and Appellants. | F063263<br><br>(Fresno Super. Ct. No. F09905302)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Robert Derham, under appointment by the Court of Appeal, for Brian Demetrius Easter, Defendant and Appellant.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Mark Patrick Thompson, Defendant and Appellant.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Ernest Tevin Williams, Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# **INTRODUCTION**

Appellants/defendants Ernest Tevin Williams, Mark Patrick Thompson, and Brian Demetrius Easter were charged with committing a series of armed robberies against three different victims over a two-day period. Two of the victims reported that they were robbed by three men.

During his postarrest interview, Williams confessed his participation in the three robberies, and said the gunman in one of the crimes was "Alex." Williams did not identify Easter as a suspect. At their joint jury trial, Thompson testified and admitted he participated in two robberies with Williams, and he was the gunman in one of the crimes. Easter did not make any pretrial statements and testified at trial that he did not commit any of the robberies. However, two of the victims identified Easter as the third suspect who robbed them.

After a joint jury trial, Williams, Thompson and Easter were convicted of counts I and II, the second degree robberies of, respectfully, Garrett Gaynor and Joshua Franco (Pen. Code,[1] § 211), and the jury found gang enhancements true for those offenses (§ 186.22, subd. (b)). The jury also found that Thompson personally used a firearm in count I, and Easter personally used a firearm in count II (§ 12022.53, subd. (b)).

Williams was separately convicted of count III, second degree robbery of Nicholas Flechsing; Thompson and Easter were not charged with this robbery. All three defendants were convicted of count IV, active gang participation in a criminal street gang (§ 186.22, subd. (a)), identified as the "Playboyz" by the prosecution's gang expert. Defendants received lengthy prison terms.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

2.

Defendants have filed separate notices of appeal and appellate briefs, and their cases have been consolidated.[2]  Thompson and Easter contend the court should have granted their motions to bifurcate and sever the gang evidence and allegations in this case.  Thompson and Williams also contend there is insufficient evidence to support the jury's findings on the gang allegations.

Williams contends there is insufficient evidence to support his conviction for count I, the robbery of Garrett Gaynor, because he merely ran away with the victim's property and did not use force or fear.  Williams also challenges the instructions given for that count.

Easter contends his defense attorney was ineffective for failing to file pretrial motions to exclude the victims' identifications of him as the third robbery suspect, because the victims looked at a single photograph which showed Williams and Easter.  Easter argues the identification procedures for him were unduly suggestive, unreliable, and violated his due process rights.

Easter raises an issue based on the trial court's decision to exclude the portion of Williams's postarrest interview where he said that he committed the robberies with Thompson.  The court excluded that evidence based on *People v. Aranda* (1965) 63

---

[2] In their appellate briefs, each defendant generally requested to join the issues raised by the other parties to the extent applicable to each of them.  (Cal. Rules of Court, rule 8.200(a)(5).)  However, none of the defendants have offered specific arguments as to how any of the issues raised by the other parties affected their unique circumstances and the facts surrounding their own convictions.  "Joinder may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice [citations] .…" (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)  "Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice.  [Citations.]" (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.)  Defendants have failed to make particularized prejudice arguments.  In any event, we will find all the issues raised by the parties are without merit.

3.

Cal.2d 518 (*Aranda*), and *Bruton v. U.S.* (1968) 391 U.S. 123 (*Bruton*), since Williams did not testify. The court admitted the evidence that Williams said the gunman was "Alex" and did not identify Easter as a suspect.[3] Easter contends his defense attorney should have renewed his motion to admit Williams's statements that he committed the robberies with Thompson, since Thompson testified at trial and admitted he committed the robberies, and the entirety of Williams's statement would have had more credibility with the jury.

Finally, Easter contends the court should have granted his motion to reopen the defense case to call a witness who would have testified about Easter's character and his purported alibi.

We will affirm.

## FACTS

### Robbery of Josh Franco (count II; defendants Williams, Thompson, Easter)

Josh Franco, a high school teacher, placed a cell phone for sale on Craigslist, an Internet sales site. Franco listed his personal cell phone as the contact number.

At 11:00 a.m. on September 7, 2009, Franco received a call from a 408 area code. A man said he wanted to meet and look at the phone. The caller, later identified as defendant Williams, said he needed to delay the meeting because he was in church. At 1:30 p.m., Williams again called Franco and said to meet him in a church parking lot at Ashlan and Hughes.

---

[3] As we will explain in issue VIII, *post*, the *Aranda/Bruton* rule "declares that a nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given. [Citation.]" (*People v. Anderson* (1987) 43 Cal.3d 1104, 1120, superseded by statute on other grounds as explained in *People v. Letner* (2010) 50 Cal.4th 99, 163, fn. 20.)

At 3:00 p.m., Franco drove into the church's parking lot. Williams called and said he was running late. Franco waited for 15 minutes and was about to leave when he saw a black SUV driving on the adjacent street. The SUV pulled into an apartment complex. Franco believed there were more than three people in the vehicle and thought the occupants were looking at him.

About five minutes later, three African-American males walked across the street and approached Franco's truck. The three men tried to open the front passenger door, but it was locked. Franco got out of his vehicle and spoke to the men. One of the men asked to see the cell phone. Franco believed this man was the person who called him (Williams). He looked at the phone and said it was in good shape.

Within seconds, another man in the group pulled a gun and said: " 'Give us everything you got.' " Franco testified the gunman had shoulder-length dreadlocks and a goatee. He was wearing a white T-shirt, black shorts, and a black baseball cap. Williams and the third man emptied Franco's pockets in about 10 seconds. The three men then ran across the street, toward the apartment complex. Franco testified none of the men said anything about gangs during the robbery.

As we will explain, *post*, Williams and Thompson admitted their participation in this robbery. Easter denied committing the crime. Franco identified Easter as the suspect with the dreadlocks, and said he was the gunman.

Based on this offense, defendants Williams, Thompson, and Easter were charged and convicted of count II, second degree robbery of Franco. The jury found true the gang enhancement, and that Easter personally used a firearm.

**Robbery of Nicholas Flechsing (count III; defendant Williams, only)**

Nicholas Flechsing, a college student, listed his Xbox video game console for sale on Craigslist. In the late morning or early afternoon of September 9, 2009, Flechsing received a call from a phone with a 408 area code. The caller, later identified as

5.

Williams, said he wanted to buy the Xbox. Flechsing told Williams to meet him at Fig Garden Village, and Williams agreed.

Flechsing rode his bicycle to Fig Garden Village and waited for 20 minutes, but the prospective buyer did not appear. Flechsing called him back, and the man said he was "taking a little bit longer than usual." Williams asked if they could meet somewhere else. They agreed to meet at the corner of Ashlan and Palm. Flechsing rode his bicycle there, but the man never showed up.

Flechsing made another call, and Williams said that he was on his way. Flechsing rode his bicycle toward the railroad tracks at Ashlan and Fruit, and waited for 5 to 10 minutes. Williams called Flechsing and said he could see him down the street, and directed Flechsing to meet him at the corner of Fruit and Swift.

Flechsing rode his bicycle to the new location. Williams was standing on the street. Williams walked up to his bicycle. Flechsing opened his backpack and showed the Xbox to Williams, and asked for $400.

Flechsing testified that Williams started to grab his backpack. Suddenly, another man appeared and pulled a handgun from his waistband. The gunman was African-American, and his hair was shoulder-length and in dreadlocks.

Flechsing testified the gunman cocked the weapon, loaded the chamber, and pointed the gun at his chest. The gunman ordered Flechsing to give him his property. Flechsing gave Williams his backpack with the Xbox; his cell phone; and his wallet, which contained his identification and $200.

Williams and the gunman looked Flechsing "up and down," and then ran down the street. Flechsing started to ride away on his bicycle. The gunman turned around and pointed his handgun at Flechsing. Flechsing raised his hands and said, " 'I'm not going to do anything.' " Williams and the gunman ran away. Flechsing testified that neither suspect wore red or blue, and they did not say anything about a gang during the robbery.

6.

As we will explain, *post*, Williams confessed to his involvement in this robbery. Williams was separately charged and convicted of count III, second degree robbery of Flechsing. Prior to trial, Flechsing never identified anyone as the gunman or second robbery suspect. Thompson and Easter were not charged with or convicted of committing this robbery.

**Robbery of Garrett Gaynor (count I; defendants Williams, Thompson, Easter)**

Garrett Gaynor[4] listed his Blackberry Gold phone for sale on Craigslist. Gaynor listed his own cell phone as the contact number.

On September 9, 2009, the same day that Flechsing was robbed, Gaynor received a call from a 408 area code from a man who wanted to buy the Blackberry. Gaynor agreed to meet the man at a particular location. The prospective buyer, later identified as Williams, repeatedly called back and changed the location. Gaynor finally told Williams that he would meet him after work. They agreed to meet at the Walgreens parking lot at Ashlan and Marks.

At 9:00 p.m., Gaynor arrived at Walgreens, parked his car, and waited. Williams called him again and asked if he was there. Gaynor said yes. Gaynor testified that three young African-American men appeared at his car. Williams asked Gaynor if he was selling a phone. Gaynor said yes. Williams was holding a white T-Mobile cell phone.

Gaynor testified the second man was wearing a red baseball cap and blue jeans. The third man had shoulder-length black hair, which was in dreadlocks with red tips.

Gaynor got out of his vehicle and met the three men at the back of his car. He showed them the Blackberry and handed it to Williams. Williams examined the Blackberry and asked if it could hold a charge. Gaynor said he had the power plug and

---

[4] On appeal, defendant Thompson erroneously describes this victim as "Robert Gaynor."

suggested they walk to Walgreens to charge the phone.  As the group started to walk toward the store, Williams ran away with Gaynor's phone.**5**

Gaynor testified that Williams ran toward an apartment complex.  The other two men asked Gaynor where Williams went.  Gaynor replied:  "… I don't know, let's go get him.  And as that started happening, they had taken off, as well, across the street," in the same direction as Williams.

Gaynor testified:  "I proceeded to follow them, or chase them."  The two men ran toward an apartment complex's side gate.  They went inside, and the gate closed behind them.

Gaynor ran to the gate, but it was locked.  Gaynor testified that when he got to the gate, the three men "were just all pretty much standing there and the one individual came back out and put a gun to my head .…"

Gaynor testified the gunman was the man who was wearing the red baseball hat.  Gaynor testified Williams and the man with red-tipped black dreadlocks were clearly visible to him.  They stayed inside the apartment gate, and they stood there and watched the gunman.

Gaynor testified the gunman put the gun to his forehead and order him to turn over everything he had, and threatened to kill him.  The gunman reached into Gaynor's pockets and took Gaynor's wallet and personal cell phone.  Williams and the man in the dreadlocks stayed in their same location and watched.  The gunman placed the gun under Gaynor's chin and threatened to kill Gaynor if he turned around.

---

**5** In issue IV, *post*, we will address and reject Williams's contention that his conviction for robbery should be reversed because he ran away with Gaynor's cell phone without using force or fear.

8.

After taking the property, the gunman ran back inside the apartment gate, joined Williams and the other man, and all three men ran away. Gaynor testified the three suspects never said anything about gangs during the robbery.

As we will explain, *post*, Gaynor identified Williams and Thompson during an infield show-up on the night of the robbery and said Thompson was the gunman. Gaynor later identified Easter from a single photograph as the third suspect with the dreadlocks. Williams and Thompson admitted their involvement in this robbery. Easter denied committing the crime.

Based on this offense, Williams, Thompson and Easter were charged and convicted of count I, second degree robbery of Gaynor. The jury found true the gang enhancement, and that Thompson personally used a firearm.

**INVESTIGATION OF GAYNOR ROBBERY**

**Discovery of handgun and stolen property**

Around 10:10 p.m. on September 9, 2009, several officers responded to the Walgreens parking lot and interviewed Gaynor about the robbery. Based on Gaynor's information, the officers spoke to the manager of the apartment complex on Ashlan and Marks. The manager's information led them to a particular apartment. The tenant gave the officers permission to enter.[6]

Defendants Thompson and Williams were in the apartment. The officers found Flechsing's stolen Xbox and videogames in the living room, and his ATM card in another room.

---

[6] At trial, Thompson testified this apartment was his grandmother's residence.

9.

The officers found a large stereo speaker box in the bedroom. It contained a nine-millimeter semiautomatic handgun and a magazine. The magazine was loaded with live nine-millimeter rounds and appeared to fit the weapon.[7]

The same stereo speaker box also contained three cell phones: Gaynor's Blackberry that he showed to Williams and he ran away with; Gaynor's personal cell phone that was taken by the gunman; and a white T-Mobile cell phone.

**Gaynor's identification of Thompson and Williams**

As the investigation continued on the night of September 9, 2009, the officers drove Gaynor past two or three men standing on the street, near the apartment complex, and asked Gaynor if any of these men were the robbery suspects. Gaynor said no.

Later that night, an officer escorted Gaynor to an infield show-up of three other men: Williams, Thompson, and a third man. Easter was not present.

Gaynor immediately identified Thompson and Williams as two of the robbery suspects, and said Thompson was the gunman. Gaynor said he was 100 percent certain of the identifications. Gaynor said the third man in the show-up was not involved in the robbery.[8]

The record implies that Thompson and Williams were arrested that night.

**Williams's postarrest interview**

In the early morning hours of September 10, 2009, Detective Mares interviewed Williams at the police substation. Mares advised Williams of the warnings pursuant to

---

[7] Detective Patrick Mares, the investigating officer, later testified that he did not try to obtain fingerprints from the handgun, and that was a "complete[] oversight on my part."

[8] Detective Mares testified that Tyrone Williams was one of the men who Gaynor was asked to look at during an infield show-up on the night of the robbery. Mares described Tyrone Williams as African-American, tall, thin, and with short hair. Gaynor did not identify Tyrone Williams as one of the robbery suspects.

*Miranda v. Arizona* (1966) 384 U.S. 436, and Williams waived his rights. Williams was 16 years old.

Detective Mares asked Williams about the while T-Mobile cell phone found in the apartment, next to Gaynor's stolen phones. Williams said it was his cell phone and had a 408 area code. Detective Mares determined that 14 calls were placed from Williams's cell phone to Franco's cell phone. There were 10 calls placed from Williams's cell phone to Gaynor's cell phone.

During the interview, Williams admitted that he had been involved in the robberies in the church parking lot (Franco), the Walgreens parking lot (Gaynor), and the one involving the Xbox (Flechsing). Williams said that at the Walgreens robbery of Gaynor, he ran away with the victim's cell phone. He also said a gun was used.

Detective Mares testified that Williams said a gun was also used during the robbery in the church parking lot, and two cell phones were taken from the victim (Franco). Williams said the gunman's name was "Alex" or "A-1." Detective Mares testified that Williams did not identify Easter as the gunman or a suspect in the robbery.[9]

As for the Xbox robbery of Flechsing, Williams said that he took the victim's backpack and the Xbox, and ran away. Williams said that a gun was also used during this robbery. He did not identify the gunman.

**The cell phone picture of Easter**

Gaynor told the officers that the third robbery suspect was slightly taller, and his hair was in dreadlocks with red tips. Later on September 10, 2009, Detective Mares

---

[9] As we will explain in issue VIII, *post*, Williams also said that he committed the robberies with Thompson. The court excluded Williams's statements which implicated Thompson pursuant to *Aranda/Bruton*. The court admitted evidence that Williams identified "Alex" as the gunman, and he did not name Easter as a suspect. During trial, Thompson testified and admitted he committed the robberies. On appeal, Easter contends his defense attorney was prejudicially ineffective for failing to move for the admission of Williams's implication of Thompson, once Thompson testified and admitted his guilt.

11.

reviewed the photographs on Williams's T-Mobile cell phone to see if anyone matched Gaynor's description.

Mares found a photograph on Williams's cell phone, identified as exhibit No. 7, which showed two African-American males: Williams, and a man with his hair in dreadlocks with red tips. The cell phone also contained a photograph of Williams, Thompson, and the man with the red-tipped dreadlocks. Officer Robert Yeager reviewed the images and identified the man with the dreadlocks as Brian Easter, based on Yeager's prior contacts with him.

**Gaynor's identification of Easter[10]**

On September 10, 2009, Detective Mares showed Gaynor the photograph of Williams and Easter, identified as exhibit No. 7, as it was displayed on the white T-Mobile cell phone. Mares did not reveal their identities, and he read the following admonition to Gaynor:

> "… I was in possession of a phone[,] that it was not my phone. I told him that there was a photograph on this phone that I wanted him to look at. I told him that I did not know who was in the photograph, I did not know the name of the individual. And I told him that, 'It may or may not be involved in your case.' "

Detective Mares testified that Gaynor looked at the cell phone photograph and said both men were involved in the robbery. Gaynor testified that he had already identified one man on the night of the robbery, as the suspect who ran off with the Blackberry (Williams). Gaynor identified the other man in the photograph, with the red-tipped

---

[10] In issue VII, *post*, we will address Easter's contentions that his defense attorney was ineffective for failing to file pretrial motions to exclude the victims' identifications of him as the third suspect. Easter contends the identification procedures violated his due process rights because they were unduly suggestive and unreliable, since the victims made the identifications from exhibit No. 7, a single photograph depicting Easter and Williams together, and they never reviewed any photographic lineups for the third suspect.

dreadlocks, as the third robbery suspect. Gaynor said the man with the dreadlocks did not have the gun.

Gaynor also said he recognized the white T-Mobile phone which contained the photograph because Williams was holding it during the robbery.

**Franco's identification of Easter**

Also on September 10, 2009, Detective Mares showed Joshua Franco the photograph of Williams and Easter, as depicted on the white T-Mobile cell phone. Mares did not identify the men, and read the same admonition to Franco as he read to Gaynor.

Franco identified Easter as the robbery suspect with the dreadlocks, and said this man held the gun during the robbery in the church parking lot. Franco also recognized the white T-Mobile cell phone, and said the smaller suspect (Williams) used it during the robbery.

Easter was arrested on November 14, 2009.[11]

**Photographic lineups**

Detective Mares showed Franco several "six-pack" photographic lineups, which included pictures of Williams and Thompson. Franco identified Thompson as the man who went through his pockets during the robbery. Franco did not identify Williams from the lineups.[12]

Detective Mares never showed Franco or Gaynor any six-pack photographic lineups with Easter's picture. Mares admitted that was "not standard operating procedure." Mares confirmed he only showed a single photograph to Gaynor and Franco,

---

[11] Officer Todd Turney testified that he came into contact with Easter on November 14, 2009, about two months after the robberies. At that time, Easter's hair was short and almost shaved, and not in dreadlocks. Officer Yeager testified that by the time of trial, Easter had shaved his hair off.

[12] While Franco did not identify Williams from the photographic lineups, Williams confessed that he committed all three robberies, including the robbery of Franco in the church parking lot.

13.

Williams and Easter were in that picture, and he showed the picture to the victims after Williams had been identified.

Detective Mares testified that he looked for the suspect who Williams identified as "Alex" or "A-1," but he never found such a person.

## THE VICTIMS' TRIAL TESTIMONY AND IDENTIFICATIONS

**Garrett Gaynor**

Garrett Gaynor testified at trial that he identified Williams and Thompson during an infield show-up on the night of the robbery. Gaynor testified the police showed him several photographs to identify the third suspect, but none of the photographs showed that person. Gaynor testified he was finally shown a photograph of a single person, and identified that person – Easter – as the third suspect with the red-tipped dreadlocks.[13]

Gaynor testified that Detective Mares showed him a photograph of two men from a cell phone, which showed Williams and the suspect with the dreadlocks. Gaynor testified he also looked at a photograph with three individuals. When he looked at this picture, he had already identified two of the men on the night of the robbery, and he identified the third man as the suspect with the dreadlocks. Gaynor did not think that he identified Easter from the photographs which showed the suspects standing together.

Gaynor testified that exhibit No. 3 showed the three men who robbed him: the first man who spoke to him and ran off with the Blackberry (Williams), the gunman who wore the hat (Thompson), and the man with the red-tipped dreadlocks (Easter).

Also at trial, Gaynor identified Thompson as the gunman in the red hat. Gaynor identified Easter as the suspect who wore his hair in dreadlocks with red tips, even

---

[13] While Gaynor testified that he identified Easter from a photograph that showed a single person, Detective Mares testified that Gaynor made the identification after looking at exhibit No. 7, the photograph from Williams's cell phone which showed Williams and Easter.

14.

though Easter's hair was now in a short buzz-cut. Gaynor identified Williams as the person who called him about the Blackberry, met him at his car, and ran away with the phone.

Gaynor reviewed the photograph of the nine-millimeter semiautomatic handgun found in the apartment on the night of the robbery. Gaynor identified the firearm as the weapon the gunman held at his head, which had a silver barrel and black handle. Gaynor again identified the white T-Mobile cell phone as the device which Williams was holding when they met in the parking lot.

## Josh Franco

Josh Franco testified that a few days after the robbery, the police showed him a series of photographic lineups. Franco positively identified one man as being involved in the robbery, but he was not sure if that man was the gunman.[14]

Franco testified he also looked at a photograph of two men. He was read an admonition before he looked at this photograph, and told that it might not be the suspect. He identified one man as the gunman, and he was positive about the identification when he made it.[15]

At trial, Franco identified defendant Thompson as one of the robbery suspects, and Thompson was not the gunman. He believed Thompson was the man he identified in the photographic lineup. Franco testified that he initially believed the man he identified in

---

[14] Detective Mares testified that Franco identified Thompson from the photographic lineup, and said that Thompson went through his pockets during the robbery. Williams confessed to his involvement in the Franco robbery.

[15] Detective Mares testified Franco identified Easter as the robbery suspect with the dreadlocks, and said this man held the gun during the robbery in the church parking lot.

the photographic lineup (Thompson), and the man in the single photograph (Easter), were the same person, but later realized they were different people.[16]

Franco reviewed the photograph of the handgun found in the apartment (Exhibit No. 26), and testified it was very similar to the firearm used by the gunman during the robbery. Franco recognized the silver barrel and the distinctive black handle.

## Nicholas Flechsing

Nicholas Flechsing testified that about three days after the robbery, Detective Torres showed him several photographic lineups. Flechsing identified Williams from one of the lineups (Exhibit No. 43), and said he was "absolutely positive" that Williams was the man who called him and met him on the street. Williams was not the gunman. At trial, Flechsing identified Williams as the man who met him on the street. Flechsing did not identify anyone from the photographic lineups as the gunman.[17]

Flechsing testified the chrome-plated handgun with the black grip, which was found in the apartment, was similar to the weapon used by the gunman during the robbery.

## THE PROSECUTION'S GANG EXPERT

As to counts I and II, the robberies of Gaynor and Franco, gang enhancements were alleged as to all three defendants (§ 186.22, subd. (b)(1)). In count IV, defendants

---

[16] As we have already explained, exhibit No. 7 was the photograph on Williams's cell phone depicting Easter and Williams.

[17] Prior to trial, Flechsing never identified anyone else as a suspect. At trial, however, Flechsing testified he thought Thompson was the gunman, although he thought that Thompson's hair was shorter and no longer in dreadlocks. The record implies that Flechsing indicated that Easter was not the gunman. Williams, who confessed that he robbed Flechsing, was the only defendant charged with this robbery. Thompson and Easter were not charged with the offense, even after Flechsing's trial identification of Thompson.

16.

were charged with the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)).

Fresno Police Officer Ron Flowers testified as the prosecution's gang expert. He had been a gang investigator with the Multi-Agency Gang Enforcement Consortium (MAGEC) since 2003. He worked specifically with African-American gangs in Fresno. He had investigated close to 600 gang-related crimes. Flowers identified gangs, validated an individual's gang membership, and tracked crimes committed by gang members. Flowers had qualified as a prosecution gang expert approximately 40 times.

**The "Playboyz" Gang**

Officer Flowers testified that the "Playboyz" is an African-American criminal street gang. Flowers first became aware of the Playboyz in 2004 or 2005, when a shooting occurred which involved four victims. Flowers verified the four victims were members of the Playboyz gang. Flowers validated the existence of the Playboyz at that time.[18]

> "My partner and I were able to verify that there was a group that called themselves the Playboyz here in Fresno [C]ounty, and eventually we were able to identify members of that particular group. And that was confirmed through certain crimes that occurred in the city of Fresno."

Officer Flowers testified the Playboyz's primary colors were blue and red. Flowers acknowledged that blue was commonly claimed by the Crips, while red was claimed by the Bloods. However, Flowers explained that it was not unusual for a Fresno gang to claim both red and blue. "It is not like Bloods and Crips. We have gangs that have Bloods and Crips within themselves[,]" and "[i]t is not unusual here in Fresno to find those two groups in one gang …." Flowers testified that African-American gangs in Fresno and Los Angeles had different philosophies about colors. For the gangs in Fresno,

---

[18] Flowers testified there was also an unrelated southern Hispanic criminal street gang known as the "Playboyz."

colors were "not critical" and did not have "much of an adverse effect as it does in Los Angeles."

Officer Flowers believed there were approximately 34 to 35 members of the Playboyz in Fresno. Flowers personally knew three or more members of the gang. Flowers had conversations with members of the Playboyz about their lifestyles, loyalties, criminal gang activities, membership, signs, colors, tattoos, and graffiti. Flowers testified he reviewed about 60 police reports about the activities of the Playboyz.

The Playboyz gang used the "Playboy" emblem from Hugh Hefner's Playboy magazine as one of their symbols. The gang members also configured their hands to appear like Playboy bunny ears. Flowers had seen rivals mocking the same hand sign.

Flowers testified that the area under the Playboyz's "dominion of control" was in northwest Fresno, between Herndon and McKinley, and Polk and Marks. The Playboyz did not claim that area as its specific turf, but "there have been a lot of events specific to this group within that area."[19]

Flowers had also seen the word "Playboyz" used in gang writings on clothing, documents, glass, and MySpace pages. However, he had never seen any Playboyz-related graffiti in a particular area or anywhere else in Fresno. Flowers explained that some gangs are not "turf-oriented" and don't have issues over particular territories.

**Primary activities**[20]

Officer Flowers testified that he had reviewed approximately 70 to 80 police reports involving members of the Playboyz gang. Flowers testified the primary activity

---

[19] A defense investigator testified he did not find any graffiti in Fresno relating to the Playboyz gang, in the area where the gang allegedly claimed turf. The investigator admitted that he was not familiar with the gang's different slang terms and abbreviations, and he only looked for pictures of rabbits.

[20] In issue II, *post*, we will address defendants' contentions that there is insufficient evidence to support the "primary activities" element of the gang allegations.

of the Playboyz gang was robbery, in violation of section 211. Flowers's opinion was based on his review of approximately 12 police reports involving incidents where members of the Playboyz committed robberies, from 2006 to 2009. Flowers testified the gang had "the pattern, again the consistency of violating Penal Code [section] 211."

Flowers testified he had also investigated homicides, shootings, and firearm cases which involved members of that gang.

**Predicate offenses**

Flowers testified about several predicate offenses committed by validated members of the Playboyz gang, based on his review of certified copies of their convictions. These predicate offenses were not committed by any of the defendants. In 2005, Christopher Williams was convicted of murder (based on a vehicular homicide), transportation of narcotics for sale, and possession of cocaine base for sale. In 2006, Duane Perry was charged with second degree robbery and convicted of attempted grand theft. In 2008, Anthony Skinner was convicted of illegal possession of a weapon. In 2009, Rafael Houston pleaded guilty to illegal possession of a weapon. In 2009, Robert Tyler was convicted of illegal possession of a weapon; and in 2008, he was convicted of vehicle theft.

On cross-examination, Flowers conceded that while these predicate offenses were committed by members of the Playboyz gang, there were no gang enhancements alleged or found true in those cases. Flowers also conceded that none of the predicate offenses involved robbery charges. Flowers further testified that he did not believe anyone had been convicted of the substantive offense of active participation in a criminal street gang as a member of the Playboyz.

**Defendants' memberships in the Playboyz**

Officer Flowers testified to his opinion that Thompson, Williams, and Easter were active members of the Playboyz gang. Thompson admitted being a member of the Playboyz on six occasions in jail classification settings in January and April 2008, and

19.

January, February, and September 2009. On January 5, 2009, Thompson admitted his gang affiliation to Fresno homicide detectives.

Thompson had been documented as associating with Playboyz gang members in June 2003, August 2003, November 2004, and May 2007. Thompson was arrested with other members of the Playboyz on July 4, 2004, November 6, 2004, and January 23, 2009.

Officer Flowers classified Thompson as an active participant in the gang based on the crimes he had committed, and his regular association with other active members of the gang. Flowers identified Thompson in a photograph which showed him making the Playboyz hand sign, placing his fingers like rabbit ears. Thompson had a tattoo of the Playboy bunny on his left arm, with the word "Playboyz" written underneath it.

Officer Flowers testified that Easter was arrested on February 14, 2006, with Tyrone Williams, a member of the Playboyz. On May 24, 2008, Easter was documented as associating during a shooting incident with Tyrone Williams, Anthony Silva and Maharie Kidan, who were also members of the Playboyz. On July 10, 2008, Easter was arrested with Robert Lee and Maharie Kidan. On January 3, 2009, Easter was with Tyrone Williams when he was contacted about being present during a homicide. On April 8, 2009, Maharie Kidan was arrested, and he claimed Easter provided him with a weapon. On May 28, 2009, Easter was contacted during a traffic stop with Anthony Skinner, a member of the Playboyz.

Flowers testified that Easter's nickname was "Kook." Flowers classified Easter as an active participant in the Playboyz based on his behavior and nature and frequency of his contacts.

Officer Flowers testified that on January 3, 2009, Williams was identified as a member of the Playboyz by homicide detective Todd Frazier. On April 27, and July 19, 2009, Williams was documented as associating with, respectively, Tyrone Williams and

20.

Jason Bryant, members of the gang. On June 7, and September 10, 2009, Williams admitted to juvenile probation officers that he was a member of the Playboyz gang.

Flowers testified Williams was an active participant in the Playboyz gang because "his behavior is more than nominal, as we outlined the many contacts through law enforcement and the related offenses during those investigations."

**Williams's cell phone and the videos**

Williams's cell phone contained a contact list. Officer Flowers testified the names included "PB Kook," "PB Crane," "PB Gunne," and "PBJKIDDDDD." Flowers believed "PB" was an acronym for "Playboyz."[21]

There were also two videos on the cell phone. Both videos were played for the jury in this case.[22]

One video showed Easter, Thompson, Williams, and another man in the bathroom of the same apartment which was searched on the night of the robbery. Thompson was holding a semiautomatic handgun, which was similar to the weapon found in the apartment and identified by the victims. The "bathroom" video was recorded on September 4, 2009.

Officer Flowers testified that defendants' conduct on the "bathroom" video supported his opinion that they were members of the Playboyz, based on their dialogue, hand signs, displays of tattoos and the gun, and discussion of specific rivals. The defendants mentioned "The Mob, Klette Mob, also known as the Laidlaw Boys" as a rival gang. Terrance Bryant was the fourth man in the video, and he displayed a red tattoo of the letter "P" on his chest.

---

[21] Easter testified at trial and admitted his nickname was "Kook."

[22] The court admonished the jury that it could consider both videos for the limited purposes of determining the elements required to prove the gang-related crimes and enhancements; credibility of the expert witness; and whether the defendants had a motive to commit the charged offenses.

The second video showed several young men in a parking lot. It was recorded on September 5, 2009. Officer Flowers testified the "parking lot" video showed Thompson, Williams, and other young African-American males. They were announcing "Playboyz," and displaying Playboyz hand signs. Officer Flowers did not see Easter in that video.

Flowers testified the expressions and statements made by defendants in the videos clearly promoted the Playboyz gang. "Judging from the content and the dialogue and the expressions made, I would be under the impression that these individuals had done something and were warning others and claiming their gang membership openly."

**The charged offenses[23]**

Officer Flowers conceded that a gang member may commit a crime or a robbery for personal reasons and not for the benefit of the gang. Based on a series of similar hypothetical questions, Flowers testified to his opinion that the robberies were committed in association with a criminal street gang. All of the perpetrators were members of the same gang, they committed the crimes in concert, and they conspired together to commit the robberies. While the participants did not say the gang's name during the robberies, the crimes benefitted the gang by building its reputation and each defendant's notoriety. The robbery proceeds also benefitted the gang financially by enabling the gang members to buy guns, and increased their individual prestige and the gang's prestige.

Officer Flowers further explained that gang members gain respect through committing acts of violence. These actions allow the gang members to instill fear in the community and among their rivals. "Other members see it, other members want to be a part of it. They want to repeat. They want to join. That's the dangerous element about group participation."

---

[23] In issue III, *post*, we will address defendants' contentions that the jury's findings on the gang enhancements must be reversed because there is insufficient evidence the robberies were committed for the benefit of, at the direction of, or in association with a criminal street gang.

## DEFENSE EVIDENCE

Thompson and Easter testified at trial; Williams did not testify.

**Thompson's trial testimony**

Thompson, who was 23 years old, admitted he had prior convictions for felony statutory rape and petty theft in 2007. He obtained the "Playboyz" tattoo on his arm when he was 14 years old to show his cousin that he liked girls.

Thompson testified that he was depicted in the "bathroom" video, which was filmed in September 2009 at his grandmother's apartment. Easter, Williams, and Terrance Bryant were also in the video. Thompson admitted that he held a gun in the video. Thompson testified that he was in a "bad place" in his life at that time. He was "… doing Ecstasy, smoking all kinds of weed, you know, just being stupid." Thompson said he was in the parking lot video with his cousins. Williams filmed the video. Easter was not there.

Thompson admitted that he was present during the Gaynor and Franco robberies, and Williams was also there.

Thompson testified the robberies were not committed for the benefit of the Playboyz or any gang, but because he needed money for his rent and he did not have a job. Thompson testified he was not present during the Flechsing robbery.

Thompson testified he robbed Gaynor at gunpoint and used the nine-millimeter handgun which was found in his grandmother's apartment. Williams and an unknown third man were also present. He said that Williams made the telephone calls to set up the robbery.

Thompson testified that he was present when Franco was robbed. Thompson was not the gunman, but the same gun was used from the Gaynor robbery. Thompson went through Franco's pockets during the robbery. Williams and an unknown third man were present during the robbery.

Thompson initially testified that the unknown suspect who was present during the Gaynor robbery was not the same unknown man who was present during the Franco robbery. As to the Gaynor robbery suspect, Thompson testified he met this man in the apartment complex, and the robbery was this man's idea.

Thompson testified he feared for his life if he identified the third suspect in the Franco robbery. Thompson knew this man from the apartment complex, and this man always wore blue and said he was a Crip. Thompson admitted he committed the Franco robbery in association with a Crip.

During cross-examination, Thompson's description of the third suspect began to change, and he admitted that the same man was the third suspect for both the Franco and Gaynor robberies. Thompson testified this man was a member of the Crips, and he knew the man was a Crip when they committed both robberies.

Thompson testified that he knew about the Playboyz, but insisted it was not a street gang: "It's a family .… [M]ost of the people that are in it are all family, all cousins and brothers." "To us it is not a gang." Thompson and some of his cousins referred to themselves as Playboyz, but he meant that he was a "player" with the girls. Thompson testified that the Playboyz partied and went to clubs when they were together.

On further cross-examination, Thompson admitted he was a member of the Playboyz and there were about 20 members, including many people in his family. Thompson knew Christopher Williams, Anthony Skinner, Christopher Williams, Jason Bryant, Tyrone Williams, and Rafael Houston, and also knew they were members of the Playboyz.

Thompson testified that members of the Playboyz did not get along with the "Northside" and "Murder Squad" gangs because they did not want to join those two gangs. Thompson repeatedly denied the Playboyz was a criminal street gang, that the members committed crimes, or that its primary purpose was to commit robberies. Thompson admitted that he claimed membership in the Playboy Crips during the jail

24.

classification interviews. He did so to avoid being jumped in jail. He said there was no such group as the Playboy Crips.

Thompson testified that Williams was a member of the Playboyz. Thompson knew Williams was a member when they committed the robberies. Thompson testified that Easter was not a member of the Playboyz, and he was not present during the Gaynor and Franco robberies.

On further questioning, Thompson testified he was not afraid to implicate Williams because he knew that Williams already talked to the police and said he was involved in the robberies. Thompson testified he knew that Easter had not implicated himself in the robberies. Thompson testified he was afraid to implicate Easter as the third suspect because Easter had not implicated himself. Thompson testified he was related to Easter, and Thompson had known Easter for his entire life. He did not want Easter to get into trouble, but denied that he would lie for Easter.

**Easter's trial testimony**

Easter testified he had known Thompson since elementary school. He did not know Thompson was a member of the Playboyz until he heard Thompson's trial testimony. He had known Williams since high school, and did not know whether he was a member of the Playboyz. Easter testified the Playboyz were people who went to "dance parties, and like going out to the clubs and stuff .…"

Easter admitted that he was in the bathroom video with Thompson and Williams, and that he saw the gun that was shown in the video. Easter testified the fourth person in the bathroom video was known as "Gunne," and Easter knew he had a "P" tattooed on his chest.[24] Easter also knew that Thompson had a tattoo of a Playboy bunny on his arm, but these tattoos meant nothing to him. Easter testified he was present when Williams spelled out the word "Playboyz" in the bathroom video. Williams testified he did not

---

[24] One of the contacts on Williams's cell phone was "PB Gunne."

25.

recall Williams talking about the Bloods and the Crips during the bathroom video, and the words meant nothing to him. Easter was not present during the parking lot video.

Easter testified he had never been charged or convicted of a crime.[25] Easter admitted he vandalized a shopping cart with Tyrone Williams in February 2006. He was taken to juvenile hall and released. He was arrested on September 10, 2008, for illegally discharging a firearm, and released the same day.

Easter admitted he was present when a homicide occurred at a party in January 2009. Easter denied that he gave a gun to Maharie Kidan on April 8, 2009. Easter was with Anthony Skinner during a traffic stop on May 28, 2009. Skinner was a close family friend, but Easter did not know if he was a member of the Playboyz.

Easter testified he was not involved in the Franco or Gaynor robberies. He was not a member of any gang, and he never committed any crimes for the benefit of a gang. Easter never called himself a member of the Playboyz, but he knew some people who used that name. Easter admitted he was known by the nickname of "Kook."[26]

Easter testified that in the fall of 2009, he was employed by a home care agency, and cared for his disabled mother under a program sponsored by the state. He lived with his mother, and he also shared an apartment with the mother of his child.

Easter testified that at the time of the Franco robbery, he was working for the home care agency and providing services to his mother. On the night of the Gaynor robbery, he was staying with his daughter and the child's mother, at their residence near Clinton and Brawley. He cut his hair sometime after the bathroom video was made in September 2009, and before he was arrested on November 14, 2009.

---

[25] In issue IX, *post*, we will address Easter's contentions that this testimony was sufficient to trigger either a defense instruction on character evidence or to reopen the defense case to call a character witness.

[26] One of the contacts on Williams's cell phone was identified as "PB Kook."

26.

**Verdicts and sentences**

After a lengthy joint jury trial, Easter, Thompson and Williams were convicted as charged with counts I and II, second degree robberies of, respectively, Gaynor and Franco (§ 211); and count IV, active participation in a criminal street gang (§ 186.22, subd. (a)). In count III, Williams was separately found guilty of the second degree robbery of Flechsing.

The jury found Thompson personally used a firearm in the commission of count I, the robbery of Gaynor; and Easter personally used a firearm in count II, the robbery of Franco (§ 12022.53, subd. (b)). As to counts I and II, the jury found the gang enhancements true (§ 186.22, subd. (b)(1).

Both Easter and Thompson were sentenced to 27 years 4 months in prison. Williams was sentenced to 18 years.

## DISCUSSION

### I.     Denial of severance/bifurcation motions on gang allegations and evidence

Thompson and Easter contend the court abused its discretion when it denied their pretrial motion to sever count IV, the substantive gang offense (§ 186.22, subd. (a)), and bifurcate the gang enhancements (§ 186.22, subd. (b)(1)), from the three robbery charges. Defendants argue the gang evidence was irrelevant and prejudicial to the robbery charges because there was no evidence the suspects committed the robberies to benefit any gang.

#### A. Background

Prior to trial, Easter moved to bifurcate the robbery charges from count IV, the gang substantive offense, and the gang enhancements; Thompson and Williams joined the motion.[27] They argued the gang evidence was irrelevant and prejudicial to the

---

[27] As we will discuss, *post*, severance is the appropriate motion for a substantive charge, while bifurcation is the appropriate motion for enhancements. (*People v. Burnell* (2005) 132 Cal.App.4th 938, 946, fn. 5 (*Burnell*).)

robbery charges. The prosecutor replied the gang evidence was relevant to prove that defendants intended to aid and abet each other in the commission of the robberies, particularly during the Gaynor robbery. The prosecutor also cited to the "bathroom" video which showed all three defendants talking about the Playboyz gang, and throwing gang signs, while Thompson held the gun which appeared to have been used in the robberies.

The trial court denied defendants' bifurcation motion:

"[T]he court does not find the inclusion of the gang enhancement or the gang charge is such that it will unduly prejudice the defendants in their ability to receive a fair trial. It does not show any extraordinary prejudice in this Court's mind. So the motion to bifurcate is denied. Because in essence what counsel is asking is not just for a bifurcation of the enhancements but for a severance of [count IV]. Because in essence it would be virtually impossible for counsel or for the Court to adequately explore the minds of potential jurors in this case concerning gangs during voir dire if the same jury was going to ultimately hear evidence on an enhancement and the gang count separate from the underlying charges. We couldn't do that. We would have to have basically a new jury which would allow counsel and the Court to explore those attitudes.

"Because by simply taking what [Williams's attorney] said, by simply mentioning gangs in the context of a jury trial, that doesn't have any information concerning gangs, at least so far as the jury is concerned. They wouldn't know what is going on in this case. They would suspect but they would not know. It will cause them to speculate, in other words, if we were to start asking them questions about an enhancement, or charges or associations without there being any charges or enhancements in the case to begin with.

"The Court is satisfied that the jurors – and the law recognizes that the jurors will do their responsibility and will follow the law. They will be informed as to any evidence concerning gang affiliation or gang conduct would be admitted for the sole purpose of determining whether the allegations are true concerning the enhancement and the charge, but they are not to consider that concerning the underlying robbery charges, only the gang charges. So the request to bifurcate is denied."

28.

**B. Bifurcation**

A trial court has broad discretion to control the conduct of a criminal trial, including the power to bifurcate a gang enhancement from trial on the substantive charges. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).) However, the need to bifurcate gang allegations is often not as compelling as for the bifurcation of prior conviction evidence. (*Id.* at pp. 1048-1049.) "A prior conviction allegation relates to the defendant's *status* and may have no connection to the charged offense; by contrast, the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense. So less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation. [Citation.]" (*Id.* at p. 1048, original italics.)

In moving for bifurcation, the defense must " 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.]" (*Hernandez, supra,* 33 Cal.4th at p. 1051.) Bifurcation may be necessary where the predicate offenses offered to establish the pattern of criminal activity are "unduly prejudicial," or where some of the other gang evidence may be "so extraordinarily prejudicial, and of so little relevance to guilt," that it may influence the jury to convict regardless of the defendant's guilt. (*Id.* at p. 1049.) We review the trial court's denial of a motion to bifurcate for abuse of discretion. (*Id.* at p. 1048.)

**C. Severance**

Joint trials of offenses which occur together are legislatively preferred over separate trials, and the party requesting severance of properly joined offenses has the burden to "clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.]" (*People v. Bean* (1988) 46 Cal.3d 919, 938-939; *Burnell*, *supra*, 132 Cal.App.4th at p. 946; see § 954.)

"In the context of severing charged offenses, we have explained that 'additional factors favor joinder. Trial of the counts together ordinarily avoids the increased

29.

expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Citation.] Accordingly, when the evidence sought to be severed relates to a charged offense, the 'burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.]" (*Hernandez, supra,* 33 Cal.4th at p. 1050.)

As with bifurcation, the court's ruling on a severance motion is reviewed for abuse of discretion. (*People v. Marshall* (1997) 15 Cal.4th 1, 27-28.) "Whether a trial court abused its discretion in denying a motion to sever necessarily depends upon the particular circumstances of each case. [Citations.] The pertinent factors are these: (1) would the evidence of the crimes be cross-admissible in separate trials; (2) are some of the charges unusually likely to inflame the jury against the defendant; (3) has a weak case been joined with a strong case or another weak case so that the total evidence on the joined charges may alter the outcome of some or all of the charged offenses; and (4) is any one of the charges a death penalty offense, or does joinder of the charges convert the matter into a capital case. [Citation.] A determination that the evidence was cross-admissible ordinarily dispels any inference of prejudice. [Citations.]" (*Ibid.*)

### D. <u>The court did not abuse its discretion</u>

The trial court did not abuse its discretion when it denied defendants' motions for severance and bifurcation of the gang allegations and evidence in this case. The gang evidence was necessarily intertwined with the charged offenses as to several relevant issues, particularly aiding and abetting, identity, and bias. As we will discuss in issue IV, *post*, one of the key issues in the Gaynor robbery was the culpability of Williams and Easter, who stood by while Thompson pulled the gun and went through Gaynor's pockets. Their joint gang status was clearly relevant as circumstantial evidence of their intent and knowledge to prove aiding and abetting to commit robbery. (See, e.g., *Burnell*, *supra*, 132 Cal.App.4th 938, 947; *People v. Salgado* (2001) 88 Cal.App.4th 5, 15-16; *In re Jose T.* (1991) 230 Cal.App.3d 1455, 1460-1461.)

30.

In addition, the defendants' common gang membership was relevant and admissible as to identity, bias, and impeachment. In his postarrest statement, Williams said that "Alex" and not Easter was the gunman for the Franco robbery. At trial, Thompson refused to identify the third suspect in the Franco and Gaynor robberies, and gave equivocal testimony about whether Easter was that man. For example, in *People v. Ruiz* (1998) 62 Cal.App.4th 234, the defendant was charged with selling drugs to an undercover officer. The defendant argued that a third party was guilty of the offense, based on that person's alleged confession to a defense investigator. *Ruiz* held the trial court properly permitted the prosecution to introduce evidence that the defendant and the third party were members of the same gang and likely knew each other, because the evidence was relevant for impeachment and bias. (*Id*. at pp. 240-243.)

As relevant to the charges in this case, "to entirely eliminate the gang evidence would have required a severance ... of the street terrorism count and the bifurcation of the gang enhancements." (*Burnell, supra,* 132 Cal.App.4th at p 947.) Defendants failed to carry their burden to clearly establish that there was a substantial danger of prejudice requiring that the charges be separately tried for severance. The gang evidence was cross-admissible as to aiding and abetting, identity, and bias of the witnesses. The substantive gang charge required much the same evidence to prove, and was no more potentially inflammatory than the other charges, such that severance would not have been appropriate. (See, e.g., *Hernandez, supra,* 33 Cal.4th at p. 1051.) In addition, the jury was correctly instructed on the limited purpose of gang evidence, including the limited admissibility of the two videos. (CALCRIM NO. 1403.) We presume the jury followed the instructions. (Cf. *Hernandez*, *supra*, 33 Cal.4th at pp. 1052-1053.)

### E. **Due process**

Finally, Thompson argues the denial of his motions for bifurcation and/or severance violated his due process right to a fair trial on the robbery charges, because of the alleged "gross unfairness" that resulted from the introduction of the gang evidence in

31.

this case. Thompson's argument is based on *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), which held:

> "To prove a deprivation of federal due process rights, [the defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is ... whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (*Id.* at pp. 229-230, fn. omitted.)

However, *Albarran* dealt with a factual scenario that was different from this case. In *Albarran,* the defendant was charged with multiple offenses based on his participation in a shooting at the victim's home. He was not charged with the gang substantive offense, but gang enhancements were alleged. The trial court permitted the prosecution to introduce gang evidence to prove the defendant's motive and intent. The jury convicted the defendant of the substantive offenses and found the gang enhancements were true. Thereafter, the trial court granted defendant's posttrial motion and dismissed the gang allegations for insufficient evidence. (*Albarran, supra,* 149 Cal.App.4th at pp. 217-222.)

*Albarran* held that while the trial court may have initially found that the defendant's gang activities were relevant and probative to his motive and intent, the court abused its discretion when it permitted the prosecution to introduce additional gang evidence that was irrelevant to the defendant's motive or the substantive criminal charges. (*Albarran, supra,* 149 Cal.App.4th at p. 217.) The irrelevant evidence included other gang members' threats to kill police officers, and references to the Mexican Mafia prison gang. *Albarran* characterized the irrelevant gang evidence as "overkill," (*id.* at p. 228, fn. omitted) and "extremely and uniquely inflammatory, such that the prejudice

32.

arising from the jury's exposure to it could only have served to cloud their resolution of the issues." (*Id.* at p. 230, fn. omitted.) *Albarran* found the gang evidence was so inflammatory that it "had no legitimate purpose in this trial," and held admission of that evidence violated defendant's due process rights. (*Id.* at pp. 230-231.)

In contrast to *Albarran*, the instant case is not "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*Albarran, supra,* 149 Cal.App.4th at p. 232.) The defendants in this case were charged with both the gang substantive offense and enhancements. The trial court did not grant a posttrial motion to dismiss either count IV or the enhancements. As we have explained, the jury was properly instructed on the limited admissibility of the gang evidence. As we will also explain in issues II and III, *post*, the jury's findings on the gang substantive offense and enhancements are supported by substantial evidence.

More importantly, Officer Flowers's expert testimony regarding the criminal activities of the Playboyz was not similar to the sensational and prejudicial testimony admitted in *Albarran*. While Flowers addressed predicate offenses committed by other members of the Playboyz, his testimony was limited to the essential facts which the prosecution was required to prove for the elements of both the gang substantive offense and the enhancements. The gang evidence in this case was no more sensational than the evidence as to the three Craigslist armed robberies committed against the victims in this case. The court did not abuse its discretion when it denied bifurcation and severance of the gang allegations, and the admission of the gang evidence did not violate defendant's due process rights.

## II. **Substantial evidence of "primary activities"**

Thompson and Williams contend there is insufficient evidence to support the "primary activities" element of count IV, the gang substantive offense (§ 186.22, subd. (a)), and the gang enhancements found true for counts I and II, the Gaynor and Franco

robberies (§ 186.22, subd. (b)(1)). Defendants acknowledge that Officer Flowers testified that robberies were the primary activities of the Playboyz, but they argue Flowers's testimony was insufficient because he merely referred to police reports as the basis for his opinion, and he failed to offer specific testimony about the nature of these alleged robberies.

## A. Substantial evidence

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The same substantial evidence standard applies when reviewing a jury's true finding on gang enhancements. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

## B. Primary activities

To establish that a group is a criminal street gang within the meaning of section 186.22, for purposes of both the gang substantive offense and the gang enhancement, "the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's *primary activities* is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457, italics added; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1221-1222; § 186.22, subd. (f).)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations," as opposed to the "occasional commission of those

crimes by [one or more of] the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*.)) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute," and may be accomplished through expert testimony. (*Id.* at p. 324, original italics.)

The enumerated criminal acts which consist of the "primary activities" include unlawful homicide, manslaughter, assault with a deadly weapon or by means of force likely to produce great bodily injury, burglary, robbery, narcotics offenses, shooting at an inhabited dwelling or motor vehicle, discharging a firearm from a motor vehicle, felony vandalism, and grand theft. (§ 186.22, subd. (e).)

To make the required showing of primary activities, the prosecution may rely on evidence of the presently charged crimes, past offenses, and evidence of crimes committed by other gang members. (*Sengpadychith, supra,* 26 Cal.4th at pp. 323-324; *People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*); *Duran, supra*, 97 Cal.App.4th at p. 1465.)

> "Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities. Both past and present offenses have some tendency in reason to show the group's primary activity [citation] and therefore fall within the general rule of admissibility [citation]." (*Sengpadychith*, *supra*, 26 Cal.4th at p. 323.)

The primary activities element may also be established through expert testimony regarding the gang's activities. (*Sengpadychith, supra,* 26 Cal.4th at p. 324; *Gardeley, supra,* 14 Cal.4th at p. 617; *People v. Vy, supra*, 122 Cal.App.4th at p. 1226) "The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities. [Citations.]" (*Duran, supra,* 97 Cal.App.4th at p.

35.

1465; *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657, disapproved on other grounds in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3.)

For example, the California Supreme Court has explained that the primary activities element might be satisfied by expert testimony of the type found in *Gardeley*, *supra*, 14 Cal.4th 605, where a police gang expert testified that the defendant's gang "was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. [Citation.]" (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324.)

Similarly, *Duran* held there was substantial evidence that one of the gang's primary activities was the commission of one or more of the statutorily enumerated offenses because the gang expert's "testimony supported a jury finding that members of the [gang] were engaged in more than the occasional sale of narcotics, robbery, or assault. [The gang expert] testified that the [gang] members engaged in these activities 'often,' indeed often enough to obtain 'control' of the narcotics trade in a certain area of Los Angeles. Evidence of the [charged] robbery and [a gang member's prior] conviction [for felony possession of cocaine base for sale] further corroborated [the expert's] testimony, providing specific examples of [gang] members' commission of robbery and narcotics offenses." (*Duran*, *supra*, 97 Cal.App.4th at p. 1465.)

### C. Analysis

There is substantial evidence to support the primary activities element of the gang allegations in this case based on Officer Flowers's testimony. It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation. (*Gardeley*, *supra*, 14 Cal.4th at p. 617; *People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) "Expert testimony may be founded on material that is not admitted into evidence and on evidence that is ordinarily inadmissible, such as hearsay, as long as the material is reliable and of a type reasonably relied upon by experts in the particular field in forming opinions. [Citation.] Thus, a gang expert may rely upon conversations with gang members, his or

her personal investigations of gang-related crimes, and information obtained from colleagues and other law enforcement agencies. [Citations.]" (*Duran, supra,* 97 Cal.App.4th at pp. 1463-1464.)

Officer Flowers testified that he was familiar with the Playboyz because he had validated the gang's existence, he had spoken to members of the gang, he was familiar with the gang's activities, and he reviewed numerous police reports about the gang's activities. Based on his extensive background and experience, he testified to his opinion that the primary activity of the Playboyz gang was robbery. Flowers's opinion was based on his review of approximately 12 police reports involving incidents where members of the Playboyz committed robberies, from 2006 to 2009. Flowers testified the gang had "the pattern, again the consistency of violating Penal Code [section] 211." Flowers testified he had also investigated homicides, shootings, and firearm cases which involved members of that gang.

Thompson and Williams argue Officer Flower's testimony was insufficient to establish the gang's primary activities, based on the holding in *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*).) In that case, the court held the gang expert's testimony lacked foundation and was insufficient to support the primary activities element. The officer testified only about general offenses committed by the gang, and about a predicate offense in which the alleged gang member was actually acquitted of the gang allegation. The officer failed to explain how he knew about the offenses. (*Id.* at pp. 611-612.) On cross-examination, the officer conceded that the vast majority of cases related to the gang involved graffiti, and he failed to specify whether the incidents involved misdemeanor or felony vandalism. (*Ibid.*) *Alexander L.* held that since "information establishing reliability was never elicited from [the expert] at trial," it was "impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Id.* at p. 612, fn. omitted.)

As explained in *People v. Martinez* (2008) 158 Cal.App.4th 1324 (*Martinez*), the gang expert in *Alexander L.* "never specifically testified about the primary activities of the gang. He merely stated 'he "kn[e]w" that the gang had been involved in certain crimes.... He did not directly testify that criminal activities constituted [the gang's] primary activities.' [Citation.]" (*Martinez, supra,* 158 Cal.App.4th at p. 1330.) The court in *Martinez* contrasted the gang expert's testimony in that case with the insufficient foundational testimony in *Alexander L.*: "[In *Martinez* ], on the other hand, [the gang expert] had both training and experience as a gang expert. He specifically testified as to [the gang's] primary activity. His eight years dealing with the gang, including investigations and personal conversations with members, and reviews of reports suffices to establish the foundation for his testimony. [Citation.]" (*Martinez, supra,* 158 Cal.App.4th at p. 1330; see also *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107-108 [distinguishing *Alexander L.*].)

In this case, Officer Flowers's testimony provided substantial evidence about the primary activities of the Playboyz. Flowers established the foundation for his testimony, he did not equivocate about the basis for his opinions, and he did not contradict himself about his opinions on the activities of the Playboyz. In contrast, the expert in *Alexander L.* failed to establish the foundation for his testimony, failed to testify the crimes he cited constituted the gang's primary activities, equivocated on direct examination, and contradicted himself on cross-examination. Flowers's testimony did not suffer from these foundational defects. (Cf. *Alexander L., supra,* 149 Cal.App.4th at pp. 611-612.) Flowers had a sufficient foundation for his opinions based on his own interactions with members of the Playboyz, his personal investigation into the gang's activities, his conversations with other law enforcement officers, and his review of law enforcement reports about the Playboyz.

38.

**III.    Substantial evidence to support gang enhancements**

Thompson contends there is insufficient evidence to support the gang enhancements found true as to counts I and II, whether the robberies of Gaynor and Franco were "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22, subd. (b)(1).) Thompson argues the Franco and Gaynor robberies were committed for his personal benefit, and there was no evidence any of the robbery suspects wore gang attire or colors, flashed gang signs, or made any remarks regarding the alleged "Playboyz" gang when the robberies were committed.

**A.  Elements of the gang enhancement**

To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was "committed for the benefit of, at the direction of, *or* in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22, subd. (b)(1), italics added.)

As to the first element, "[n]ot every crime committed by gang members is related to a gang." (*Albillar, supra,* 51 Cal.4th at p. 60.) However, the gang-related requirement for the enhancement may be shown by evidence indicating that several defendants "came together *as gang members*" to commit the offense, or that the offense could benefit the gang by elevating the gang's or gang members' status or advancing the gang's activities. (*Albillar, supra,* 51 Cal.4th at pp. 62-63, original italics; see *Gardeley, supra,* 14 Cal.4th at p. 619.) If the evidence is sufficient to establish the crime was committed "in association" with a gang, the prosecution need not prove that it was committed for the benefit of or at the direction of a gang. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*).)

As for the second element of specific intent, it does not require "that the defendant act with the specific intent to promote, further, or assist a *gang;* the statute requires only

the specific intent to promote, further, or assist criminal conduct by *gang members.*" (*Albillar, supra,* 51 Cal.4th at p. 67, original italics.) "[S]pecific intent to *benefit* the gang is not required." (*Morales, supra,* 112 Cal.App.4th at p. 1198, original italics.) The specific intent element "applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Albillar, supra,* 51 Cal.4th at p. 66, original italics.) The scienter requirement is "the specific intent to promote, further, or assist in *any* criminal conduct by gang members – including the current offenses – and not merely *other* criminal conduct by gang members." (*Albillar, supra,* 51 Cal.4th at p. 65, original italics.)

"[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar, supra,* 51 Cal.4th at p. 68.) "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

The prosecution's gang expert may testify about whether the defendant acted for the benefit of, at the direction of, or in association with a gang, even though it is an ultimate factual issue for the jury to decide, because these are matters far beyond the common experience of the jury. (*People v. Valdez, supra,* 58 Cal.App.4th at pp 508-509.)

"A gang expert['s] testimony alone is insufficient to find an offense gang related. [Citation.] '[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in

40.

association with a criminal street gang.' [Citation.]" (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.)

### B. Commission of crimes "in association with" a criminal street gang

Thompson argues there is no evidence he committed the robberies to "benefit" the Playboyz. However, several cases have found substantial evidence to support gang enhancements where gang members commit offenses "in association" with fellow gang members within the meaning of section 186.22, subdivision (b)(1).

For example, in *Morales, supra,* 112 Cal.App.4th 1176, the defendant and two fellow gang members committed a robbery and other offenses, and the jury found the gang allegations true. The prosecution's gang expert testified that, based on a hypothetical, the crimes were committed in association with a criminal street gang because "they involved three gang members acting in association with each other. The gang provided 'a ready-made manpower pool....' That is, one gang member would choose to commit a crime in association with other gang members because he could count on their loyalty. They would 'watch his back....' In addition, the very presence of multiple gang members would be intimidating. The crime would benefit the individual gang members with notoriety among the gang, and the gang with notoriety among rival gang members and the general public." (*Id.* at p. 1197.)

*Morales* rejected the defendant's argument that there was insufficient evidence that he committed the offenses to *benefit* his gang, and instead noted the gang expert's focus was on "a crime committed, not just by a gang member, but by several gang members, acting in association with each other. Also, [the expert] did not testify that such a crime necessarily would benefit the gang, merely that it would be committed *either* for the benefit of, *or* at the direction of, *or* in association with the gang." (*Morales, supra,* 112 Cal.App.4th at p. 1197, original italics.)

> "Defendant argues that reliance on evidence that one gang member committed a crime in association with other gang members is 'circular....'

41.

Not so. Arguably, such evidence alone would be insufficient, even when supported by expert opinion, to show that a crime was committed for the *benefit* of a gang. The crucial element, however, requires that the crime be committed (1) for the benefit of, (2) at the direction of, *or* (3) in *association* with a gang. Thus, the typical close case is one in which one gang member, acting alone, commits a crime. Admittedly, it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang. Here, however, there was no evidence of this. Thus, the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members.

"If defendant is arguing that there was insufficient evidence of the specific intent element (as opposed to the benefit/direction/association element), we disagree. Again, specific intent to *benefit* the gang is not required. What is required is the 'specific intent to promote, further, or assist in any criminal conduct by gang members....' Here, there was evidence that defendant intended to commit robberies, that he intended to commit them in association with [his fellow gang members], and that he knew that [they] were members of his gang. Moreover,... there was sufficient evidence that defendant intended to aid and abet the robberies [his fellow gang members] actually committed. It was fairly inferable that he intended to assist criminal conduct by his fellow gang members." (*Morales, supra,* 112 Cal.App.4th at p. 1198, original italics.)[28]

In *People v. Romero* (2006) 140 Cal.App.4th 15, the defendant drove fellow gang members to the site of a drive-by shooting, and the court found the gang enhancements were supported by substantial evidence because the defendant committed the offenses in association with fellow gang members. "There was ample evidence that [defendant] intended to commit a crime, that he intended to help [his accomplice] commit a crime, and that he knew [his accomplice] was a member of his gang. This evidence creates a reasonable inference that [defendant] possessed the specific intent to further [his accomplice's] criminal conduct." (*Id.* at p. 20.)

---

[28] Cf. *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1145 [gang member who commits a felony but acts alone does not violate section 186.22, subdivision (a), active participation in a criminal street gang].)

A similar result was reached in *People v. Martinez, supra*, 158 Cal.App.4th 1324, where the defendant admitted membership in a criminal street gang, and he committed robberies with another admitted member of that gang. The defendant argued there was insufficient evidence to support the gang enhancement because his accomplice was also his brother-in-law, and they committed the offenses for their own personal benefit. (*Id.* at pp. 1332-1333.) *Martinez* rejected the argument and noted the gang expert testified "this evidence showed defendant committed the robbery *in association* with the gang. The elements of the gang enhancement may be proven by expert testimony. [Citation.] Nor does it matter that defendant did not commit the crime on or live in gang turf or that [the gang expert] had never heard of defendant or [his accomplice]. Defendant did not even need to be an ' "active" ' or '"current, active" ' gang member. [Citation.]" (*Id.* at p. 1332, italics added.) "Here defendant, an admitted gang member sporting gang tattoos, actually committed the robbery with a gang confederate. That he was not in his gang's territory, by itself, does not necessarily overcome the other supporting evidence." (*Id.* at p. 1333.)

In *People v. Leon* (2008) 161 Cal.App.4th 149 (*Leon*), the defendant and an accomplice were members of the same gang, and they stole a car and threatened an eyewitness. The defendant argued there was insufficient evidence that he committed the offenses for the benefit of his gang. *Leon* relied on *Morales* and *Romero,* and rejected this argument because "a 'specific intent to *benefit* the gang is not required.' [Citation.]" (*Leon*, *supra*, at p. 163.) *Leon* held there was substantial evidence that the defendant committed the offenses in association with a fellow gang member. There was also evidence of the defendant's specific intent because he intended to commit the offenses, he intended to do so in association with his accomplice, and he knew his accomplice was a member of his gang. (*Ibid.*)

C. **Analysis**

Thompson argues there is insufficient evidence the Gaynor and Franco robberies were gang related, based on several cases which affirmed gang enhancements in situations where gang members committed particular offenses for the benefit of their particular criminal street gangs because they were claiming gang turf, selling drugs on that turf, shouting gang names, and/or seeking to instill fear in the area. (See, e.g., *Albarran*, *supra*, 149 Cal.App.4th at pp. 220-221; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1197-1199; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 928; *People v. Ochoa*, *supra*, 179 Cal.App.4th 650, 661-664.)

Thompson's reliance on these cases is misplaced. In this case, as in *Morales, Martinez,* and *Leon,* there is substantial evidence to support the gang enhancements because each defendant, an active member of the Playboyz criminal street gang, committed the Franco and Gaynor robberies "in association with" two other active members of the Playboyz. The defendants acted in concert with each other. Williams placed the telephone call, pretending to be interested in the sales item, and lured the victims to secluded or dark areas to conduct the transaction. Williams approached the victim at the designated location, and again stated his intent to look at the item. Thompson and Easter arrived, and took turns as the gunman. The three defendants arrived and fled together, taking the victims' property. The videos on Williams's cell phone demonstrated that each defendant knew that the other defendants claimed membership in the Playboyz. There was thus overwhelming evidence that defendants knew their associates were gang members, they each intended to commit the robberies in association with the others, and the stolen property from all the robberies were found in the apartment of Thompson's grandmother, where Thompson and Williams were arrested shortly after the Gaynor robbery. We conclude that the jury's true findings on the gang enhancements in this case are supported by substantial evidence.

44.

**D. _Albillar_**

Defendant Thompson further argues that gang connection in this case was "incidental" to the Gaynor and Franco robberies because he committed the crimes for personal reasons, and he "sought back up from family" who happened to be members of the Playboyz. Defendant Thompson asserts his "position is somewhat borne out" by _Albillar, supra,_ 51 Cal.4th 47, where the California Supreme Court addressed a substantial evidence challenge to the gang enhancements found true as to defendants' sexual assault convictions in that case. The defendants in _Albillar_ argued the sexual assaults were not "gang-related" because the defendants were related to each other, they lived together, and it was conceivable that " 'several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang.' [Citation.]" (_Id._ at pp. 59-60, 62.)

_Albillar_ rejected defendants' arguments and found there was substantial evidence to support the gang enhancements for two reasons: the offenses were committed in association with gang members, and the offenses were committed for the benefit of the gang. (_Albillar, supra,_ 51 Cal.4th at p. 60.) "The record supported a finding that [the] defendants relied on their common gang membership and the apparatus of the gang in committing the sex offenses against [the victim]." (_Ibid._) In particular, the court cited expert testimony about how gang members earn respect and status by committing crimes with other members, and that gang members choose to commit crimes together in order to increase their chances of success and to provide training for younger members. (_Id._ at pp. 60-61.)

_Albillar_ concluded that defendants' conduct, where each participant assisted the others without a word being spoken, and each could rely on the silence of the others and group intimidation of the victim, "exceeded that which was necessary to establish that the offenses were committed in concert." (_Albillar, supra,_ 51 Cal.4th at p. 61.)

45.

"Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police and on the gang's reputation to ensure that the victim did not contact the police." (*Id.* at pp. 61-62.)

*Albillar* also found substantial evidence the crimes were committed to benefit the gang. (*Albillar, supra,* 51 Cal.4th at p. 63.) The court cited the gang expert's testimony, that " '[w]hen three gang members go out and commit a violent brutal attack on a victim, that's elevating their individual status, and they're receiving a benefit. They're putting notches in their reputation. When these members are doing that, the overall entity benefits and strengthens as a result of it.' Reports of such conduct 'rais[e] the[ ] level of fear and intimidation in the community.' " (*Ibid.*) *Albillar* explained:

"Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of ... a[ ] criminal street gang' within the meaning of section 186.22[, subd.] (b)(1)." (*Ibid.*)

Thompson asserts *Albillar* supports his evidentiary challenge to the gang enhancements in this case based on several factors: there were strong family ties between Williams, Easter, and Thompson, these ties prompted the family to "work together," the robberies were committed solely for Thompson's personal benefit to pay his rent and not for any gang, and Officer Flowers did not offer expert testimony similar to the expert who testified in *Albillar*, that defendants committed the robberies to intimidate others, and enhance their reputation and status in the gang.

Thompson presented similar arguments to the jury, when he testified that he committed the robberies because he needed the money to pay his rent, and he did not intend to benefit any gang. These arguments were completely dependent on the jury's determination of Thompson's credibility, and the verdicts and findings in this case infer the jury rejected Thompson's veracity.

As acknowledged by *Albillar*, not every crime committed by gang members is gang-related for purposes of the enhancement, and the mere fact that gang members commit a crime together does not mean the crime is gang-related for purposes of section 186.22, subdivision (b). (*Albillar*, *supra*, 51 Cal.4th at pp. 60, 62.) As in *Albillar*, however, there was substantial evidence to support the gang enhancements in this case because the three defendants "came together *as gang members* to [rob the victims] and, thus … they committed [the substantive offenses] in association with the gang." (*Id*. at p. 62, original italics.)

Thus, as to the first element of the enhancement, defendants Williams, Thompson and Easter came together to commit a series of robberies in association with each other, the "bathroom" video demonstrated their knowledge of each other's affiliation, and they committed offenses which Officer Flowers identified as the primary activity of the Playboyz. As to the second element of the enhancement, there was evidence the defendants intended to, and did commit, the robberies with known members of a gang, and the jury could have fairly inferred that defendants had "the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar*, *supra*, 51 Cal.4th at p. 68.)[29]

## IV. Substantial evidence to support Williams's conviction for Gaynor robbery

Defendant Williams contends there is insufficient evidence to support his conviction in count I, the robbery of Gaynor. Williams argues that his involvement was limited to holding Gaynor's Blackberry cell phone while they were standing in the Walgreens parking lot, and then running away with it. Williams argues he cannot be guilty of robbery because he ran away with the cell phone without using any force or fear

---

[29] Given our finding that the gang enhancement is supported by substantial evidence, we need not address defendant Thompson's further contention that the related firearm enhancement could not be imposed under section 12022.53, subdivision (e).

against Gaynor. Williams argues the actual robbery occurred later on, when Thompson pulled the gun on Gaynor, and Williams was not involved in that act.

A. **Robbery**

In order to address Williams's substantial evidence challenge, we must review the elements of robbery, and the application of force or fear. "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)

"Robbery is larceny with the aggravating circumstances that 'the property is taken from the person or presence of another' and 'is accomplished by the use of force or by putting the victim in fear of injury.' [Citation.]" (*People v. Anderson* (2011) 51 Cal.4th 989, 994.) Robbery is a continuing offense, and all the elements must be satisfied before the crime is completed. (*People v. Gomez* (2008) 43 Cal.4th 249, 254 (*Gomez*).) A robbery remains in progress and is not complete until the perpetrator has reached a place of temporary safety. (*People v. Wilson* (2008) 43 Cal.4th 1, 17; *People v. Young* (2005) 34 Cal.4th 1149, 1177; *People v. Cooper* (1991) 53 Cal.3d 1158, 1161 (*Cooper*).)

"For robbery, a felonious taking requires both a taking (caption) and a carrying away (asportation). [Citation.] It is sufficient if either the caption or the asportation is accomplished through force or fear. [Citation.]" (*People v. Alvarado* (1999) 76 Cal.App.4th 156, 161, disapproved on other grounds in *People v. Lopez* (2003) 31 Cal.4th 1051, 1056.) "[A] taking is not over at the moment of caption; it continues through asportation. [A] robbery can be accomplished even if the property was peacefully or duplicitously acquired, if force or fear was used to carry it away." (*Gomez*, *supra*, 43 Cal.4th at p. 256.) "[A]sportation is not confined to a fixed point in time. The asportation continues thereafter as long as the loot is being carried away to a place of temporary safety." (*Cooper, supra,* 53 Cal.3d at p. 1165, fn. omitted.)

Even if property is initially taken without use of force or fear, the crime may become a robbery if force or fear is used to hold onto the property while it is being

carried away. (*Cooper, supra,* 53 Cal.3d at p. 1165, fn. 8.) "[M]ere theft becomes robbery if the perpetrator, having gained possession of the property without use of force or fear, *resorts to force or fear while carrying away the loot.*" (*Ibid.,* italics added.) "If the aggravating factors are in play at any time during the period from caption through asportation, the defendant has engaged in conduct that elevates the crimes from simple larceny to robbery." (*Gomez, supra,* 43 Cal.4th at p. 258.)

"In California, '[t]he crime of robbery is a continuing offense that begins from the time of the original taking until the robber reaches a place of relative safety.' [Citation.] It thus is robbery when the property was peacefully acquired, but force or fear was used to carry it away. [Citation.]" (*People v. Anderson, supra,* 51 Cal.4th at p. 994.) The "force or fear" and "immediate presence" elements may occur at any point during which the property is being carried to a place of temporary safety, as the crime has not yet concluded while it is being carried away. (*Gomez, supra,* 43 Cal.4th at p. 257.)

The scene of a robbery is not a place of temporary safety. (*People v. Young, supra,* 34 Cal.4th at p. 1177.) "Evidence may support the conclusion that no place of temporary safety has been reached while the robber is still encumbered with the victim, 'who at first opportunity might call the police.' [Citations.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1153.) " 'When the perpetrator and victim remain in close proximity, a reasonable assumption is that, if not prevented from doing so, the victim will attempt to reclaim his or her property.' [Citation.]" (*Gomez, supra,* 43 Cal.4th at p. 264.) Regardless of whether the victim gives chase, however, the perpetrator of a robbery has not reached a place of temporary safety while still in flight. (*People v. Johnson* (1992) 5 Cal.App.4th 552, 559.)

"Robbery is not confined to a fixed location, but may be spread over a considerable distance and varying periods of time. [Citations.]" (*People v. Johnson, supra,* 5 Cal.App.4th at pp. 561-562.) "[N]o artificial parsing is required as to the precise moment or order in which the elements are satisfied." (*Gomez, supra,* 43 Cal.4th at

49.

p. 254.) "Defendant's guilt is not to be weighed at each step of the robbery as it unfolds. The events constituting the crime of robbery, although they may extend over large distances and take some time to complete, are linked by a single-mindedness of purpose. [Citation.]" (*People v. Estes* (1983) 147 Cal.App.3d 23, 28.)

Whether a robber has reached a place of temporary safety is a question of fact for the jury. (*People v. Carter* (1993) 19 Cal.App.4th 1236, 1251.) An objective standard is used to determine whether "a robber had actually reached a place of temporary safety, not whether the defendant thought that he or she had reached such a location." (*People v. Johnson*, *supra*, 5 Cal.App.4th at p. 560.)

## B. **Aiding and abetting**

It is undisputed that Williams was not the gunman during the Gaynor robbery, and he was convicted as an aider and abettor. "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. [Citation.]" (*Cooper*, *supra*, 53 Cal.3d at p. 1164.) The prosecution must show that the defendant "intended to facilitate or encourage the principal offense prior to or during its commission." (*Id*. at p. 1160.)

"[T]he commission of a robbery for purposes of determining aider and abettor liability continues until all acts constituting the robbery have ceased. The asportation, the final element of the offense of robbery, continues so long as the stolen property is being carried away to a place of temporary safety. Accordingly, in order to be held liable as an aider and abettor, the requisite intent to aid and abet must be formed *before or during such carrying away of the loot to a place of temporary safety.*" (*Cooper*, *supra*, 53 Cal.4th at p. 1161, original italics; *Gomez*, *supra*, 43 Cal.4th at p. 256.)

**C. <u>Analysis</u>**

Defendant Williams contends his conviction in count I for the robbery of Gaynor must be reversed because he did not use force or fear to take the Blackberry from Gaynor. Williams argues that at most, he committed a larceny in the Walgreens parking lot when he asked to look at the Blackberry, Gaynor handed it to him, and Williams ran away with the cell phone. Williams argues that he cannot be culpable for Thompson's subsequent act of pulling a gun on Gaynor and taking property from his pockets.

However, the entirety of the record provides substantial evidence to support Williams's conviction as an aider and abettor. At trial, Thompson testified that Williams made the telephone calls to set up the robbery of Gaynor. Gaynor testified that Williams kept changing the time and meeting location. Williams used the same tactic when he contacted Franco and Flechsing – he repeatedly changed the time and location for their meeting, and lured the victims into relatively isolated areas for the actual robberies. With Gaynor, the meeting was ultimately set for 9:00 p.m. in the Walgreens parking lot.

When defendants met Gaynor in the parking lot, they arrived together and Williams asked Gaynor about the Blackberry. Gaynor handed it to Williams so he could look at it. Williams asked if the cell phone could hold a charge. Gaynor suggested they walk to Walgreens to test the power plug. Gaynor testified that he started to walk toward the store with the three defendants, and Williams suddenly ran away with the Blackberry. The record clearly suggests the reason – Williams and his companions did not want to be in the more populated area of the store as compared to the parking lot.

Williams asserts that he completed the crime of larceny at this point. However, the record suggests that his conduct was likely the result of Gaynor's decision to walk into the store. Easter and Thompson ran after Williams, Gaynor chased them to the apartment complex, and Thompson pulled his gun on Gaynor and demanded all his property. After emptying Gaynor's pockets, the three defendants ran away.

As explained *ante*, "mere theft becomes robbery if the perpetrator, having gained possession of the property without use of force or fear, resorts to force or fear while carrying away the loot." (*Cooper*, *supra*, 53 Cal.3d at p. 1165, fn. 8.) "If the aggravating factors are in play at any time during the period from caption through asportation, the defendant has engaged in conduct that elevates the crimes from simple larceny to robbery." (*Gomez*, *supra*, 43 Cal.4th at p. 258.) Williams, Easter, and Thompson did not want to confront Gaynor at Walgreens. The record strongly suggests that they ran so they could lure Gaynor away from the store. Gaynor told Easter and Thompson that he was going to follow them, and he chased them to the apartment complex. At that point, Thompson pulled the gun to both prevent Gaynor from continuing to follow them and possibly reclaim his Blackberry, and to take whatever property was still in Gaynor's possession.

"Evidence may support the conclusion that no place of temporary safety has been reached while the robber is still encumbered with the victim, 'who at first opportunity might call the police.' [Citation.]" (*People v. Barnett*, *supra*, 17 Cal.4th at p. 1153.) " 'When the perpetrator and the victim remain in close proximity, a reasonable assumption is that, if not prevented from doing so, the victim will attempt to reclaim his or her property.' [Citation.]" (*Gomez*, *supra*, 43 Cal.4th at p. 264.) While defendants had reached the apartment gate, that area was not a place of temporary safety since Gaynor followed them, he was standing directly adjacent to their position, and he was clearly not inclined to leave. The robbery was not complete when Williams ran away with the Blackberry, it was still in progress when Gaynor chased the defendants and, under the circumstances, defendants had not reached a place of temporary safety.

There was substantial evidence to find that Williams was an aider and abettor since he set up the initial meeting, kept changing the location, and lured Gaynor out of the parking lot. Once Gaynor reached the apartment gate, Thompson pulled the gun to ensure that they kept the stolen Blackberry, Gaynor did not try to recover it, and take the

52.

rest of Gaynor's property. (See, e.g., *People v. Haynes* (1998) 61 Cal.App.4th 1282, 1294.)

## V.     Robbery instructions

Defendant Williams raises two related instructional issues regarding his conviction in count I for the robbery of Gaynor. First, Williams contends the court had a sua sponte duty to give the unanimity instruction so the jury could agree which act constituted the robbery of Gaynor – when Williams ran away with Gaynor's Blackberry, or when Thompson produced the gun and emptied Gaynor's pockets. Second, Williams argues the court should have given the jury a special verdict form, so the jury could have explained which act it relied upon to find defendants guilty of the robbery of Gaynor. Both arguments are meritless.

### A. Background

During the instructional phase, Easter's attorney asked the court to consider giving the unanimity instruction. The court said it had considered the issue but decided not to give the instruction for the Gaynor robbery, because the prosecution had charged a single crime against the three defendants.

> "It does appear that there were two different contacts between the defendants and Mr. Gaynor, allegedly, but we're not talking about two separate instances of the crime of robbery, we're talking about one that is being charged by the People. And I think that is the purpose of [the unanimity instruction] is where the People are … alleging two different instances which the jury can make a determination. Some may vote one way, others may vote another way, and there is no clear showing that the jurors were unanimous as to what took place. Now, it is arguable that the jurors may conclude that there was a robbery at one location and at another location there was not a robbery. That is perfectly clear in the evidence. But then again the jurors can also conclude that this was one continuous course of conduct from one location to the other which was very close in time and proximity and allegedly involved the same individuals. So in the Court's mind, it is not distinct enough for there to be the requirement that the Court give the unanimity instruction."

Easter's attorney argued there were two separate acts in the Gaynor incident, and Easter was present when Williams ran away with the Blackberry and Thompson later pulled the gun. The court replied there were not "two separate instances of an alleged robbery." [30]

### B. Unanimity

"The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [him] guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*People v. Russo* (2001) 25 Cal.4th 1124, 1134-1135.)

When the evidence shows only a single discrete crime "but leaves room for disagreement as to exactly how that crime was committed, the jury need not unanimously agree on the theory under which the defendant is guilty. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 101.) In addition, the unanimity instruction is not required "if the case falls within the continuous-course-of-conduct exception, which

---

[30] Williams did not join Easter's request for the unanimity instruction, "but we may overlook this forfeiture because [Williams] is now arguing that the trial court is under a sua sponte duty to instruct. [Citation.]" (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 73.)

arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when the statute contemplates a continuous course of conduct of a series of acts over a period of time' [citation]." (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)

## C. <u>Analysis</u>

The unanimity instruction was not required in this case. As explained, *ante*, robbery is a continuing offense, and all the elements must be satisfied before the crime is completed. (*Gomez*, *supra*, 43 Cal.4th at p. 254.) "Robbery is not confined to a fixed location, but may be spread over a considerable distance and varying periods of time. [Citations.]" (*People v. Johnson*, *supra*, 5 Cal.App.4th at pp. 561-562.) "[N]o artificial parsing is required as to the precise moment or order in which the elements are satisfied." (*Gomez*, *supra*, 43 Cal.4th at p. 254.) A robbery may fall within the continuous conduct exception if multiple encounters between the victim and the perpetrator's are so closely connected in time. (*People v. Haynes*, *supra*, 61 Cal.App.4th at p. 1295.)

As noted by the trial court, the Gaynor robbery was a continuous course of conduct which began when Williams ran with the Blackberry and lured Gaynor away from the parking lot, and continued as Easter and Thompson further induced Gaynor to follow them, Gaynor chased defendants, and Thompson pulled the gun to stop Gaynor and take the rest of his property.

The jury herein was fully and correctly instructed on the elements of robbery as to all counts, including count I, the robbery of Gaynor. These instructions demonstrated that the jury could only convict defendants of robbing Gaynor if it found that property was taken from his immediate presence by force or fear. CALCRIM No. 1600 defined the elements of the offense, particularly whether the property was taken against the person's will, and the defendant used force or fear to take the property or to prevent the person from resisting. CALCRIM No. 1600 further stated: "The defendant's intent to take the property must have been formed before or during the time he used force or fear.

If the defendant did not form this required intent until after using the force or fear, then he did not commit robbery."

The jury received CALCRIM Nos. 400 and 401, which correctly defined the general elements of aiding and abetting. The jury also received CALCRIM No. 1603:

> "To be guilty of robbery as an aider and abettor, *the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety.* [¶] A perpetrator has reached a place of temporary safety with the property if *he or she has successfully escaped from the scene, is no longer being pursued, and has unchallenged possession of the property.*" (Italics added.)

Based on these instructions, the jury could not have convicted Williams of robbery simply based on his act of running away with the Blackberry, since it was undisputed that defendants had not used force, fear, or any type of intimidation to initially take the Blackberry from Gaynor or prevent Gaynor from following them. The jury was fully instructed on aiding and abetting, and only could have convicted Williams if it found that force or fear was used against Gaynor, and Williams formed the intent to aid and abet before the robbery or while the property was being carried away. Such evidence is supplied by Thompson's trial testimony, that Williams placed the calls to Gaynor to set up the robbery. In addition, the jury was instructed on the lesser offense of theft but obviously rejected that theory.

The unanimity instruction was also not required based on the nature of the prosecutor's closing argument. The prosecutor asserted the robbery of Gaynor was based on the entirety of the encounter, which began when Williams ran away with the Blackberry, and culminated in Thompson's act of pulling the gun after Gaynor chased them. The prosecutor never argued that Williams could be guilty of robbery when he ran away with the cell phone.

56.

For the same reasons, Williams's related instructional argument is also meritless. The court was not required to instruct the jury to return some sort of special verdict to specify which act constituted the robbery of Gaynor.

## VI. The victims' identifications of Easter

As set forth in the factual statement, Gaynor and Franco identified Easter as one of the robbery suspects after they separately looked at a single photograph which showed Williams and Easter standing together.

Easter contends that his defense attorney was prejudicially ineffective for failing to file a pretrial motion to exclude the victims' identifications based on that single photograph. Easter contends the photographic identification process was unduly suggestive and violated his due process rights because the picture showed Easter with his hair in dreadlocks and standing next to Williams, who had already been identified as one of the suspects.

### A. Background

Easter did not file any pretrial motions to argue that the identifications made by Gaynor and Franco, from the single photograph which showed Easter and Williams, violated his due process rights or was the result of unduly suggestive and unreliable procedures.

After Easter was convicted, he filed a motion for new trial and argued the court should have suppressed the identification evidence because the single photographic show-up was inherently suggestive and unreliable since it showed Easter and Williams together, the victims never looked at photographic lineups for the third suspect with the dreadlocks, and Franco did not identify Easter in court.

The People replied that Easter had waived this issue since he never objected to or moved to exclude the identification evidence. In the alternative, the People asserted the identification procedure for Easter was reliable and not suggestive.

57.

The trial court denied Easter's motion for new trial and found the identification procedure for Easter was not unduly suggestive, and it did not cause Easter to "stand out." The court believed the victims looked at a photograph which only showed Easter, and the picture did not show Thompson or Williams.[31]

The court held there was nothing in that photograph that suggested Easter stood out compared to the other live witnesses and photographs that were viewed by the victims. The victims "described very accurately" Easter's hairstyle, "even to the point of the dreadlock hairstyle having red tips." While there were inaccuracies in Franco's description of the suspect's height and facial hair, Franco immediately identified Easter from the photograph and said he was the gunman.

> "[C]onsidering all the circumstances under which this identification took place, the Court is not satisfied that the … procedure was unduly suggestive. It was not. These … victims in the case had the opportunity to view others live and in photographs and did not select those individuals. They selected the person that they believed based upon … what they went through to be the person who was involved."

The court also found that both victims received appropriate admonitions before they looked at the photograph, and the identifications were close in time to the robberies.

## B. Suggestiveness

We begin with the well-settled principles about pretrial identification procedures, which violate due process if such procedures are so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*People v. Sanders* (1990) 51 Cal.3d 471, 508.) " 'The issue of constitutional reliability depends on (1)

---

[31] As we will explain, *post*, the court's statement about the nature of the photograph used to identify Easter conflicts with the trial evidence. Detective Mares testified that Gaynor and Franco separately identified Easter when they looked at the photograph identified as exhibit No. 7, which showed both Easter and Williams. When Gaynor testified, he thought he identified Easter after looking at a photograph which only showed one person, but agreed that he also looked at exhibit No. 7.

58.

whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation].  If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.'  [Citation.]  In other words, '[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.'  [Citation.]"  (*People v. Ochoa* (1998) 19 Cal.4th 353, 412 (*Ochoa*).)

"To determine whether a procedure is unduly suggestive, we ask 'whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.'  [Citations.]"  (*People v. Yeoman* (2003) 31 Cal.4th 93, 124.)  "[F]or a witness identification procedure to violate the due process clauses, the state must, at the threshold, improperly suggest something to the witness – i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure."  (*Ochoa, supra,* 19 Cal.4th at p. 413.)  "A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police."  (*People v. Slutts* (1968) 259 Cal.App.2d 886, 891 [photographic lineup violated due process where child shown several pictures, but only one had beard drawn on it].)

The defendant bears the burden of demonstrating that the identification procedure was suggestive, unreliable, and so unfair that it violated his due process rights.  (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222; *People v. Sanders*, *supra*, 51 Cal.3d at p 508.)  The defendant must show "unfairness as a demonstrable reality, not just speculation."  (*People v. DeSantis, supra,* 2 Cal.4th at p. 1222.)  If the defendant raised and preserved the issue, we independently review the trial court's ruling that a pretrial identification procedure was not unduly suggestive.  (*People v. Avila* (2009) 46 Cal.4th 680, 698.)

59.

**C. Single-person photographic identifications**

A single-person photographic show-up is not inherently unfair or impermissibly suggestive. (*Ochoa, supra,* 19 Cal.4th at pp. 413, 425-426; *People v. Clark* (1992) 3 Cal.4th 41, 136, overruled on other grounds in *People v. Pearson* (2013) 56 Cal.4th 393, 462; *People v. Floyd* (1970) 1 Cal.3d 694, 714, overruled on other grounds in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36.) "Showing the witnesses a single photo of the defendant is no more *impermissibly* suggestive than an in-court identification with the defendant personally sitting at the defense counsel table in the courtroom. [Citations.]" (*People v. Yonko* (1987) 196 Cal.App.3d 1005, 1008-1009, original italics.)

However, numerous cases have also "condemned the use of a single photo identification procedure." (*People v. Contreras* (1993) 17 Cal.App.4th 813, 820.) Single person show-up procedures are considered unfair when they are not neutral, and unnecessarily suggest to the witness in advance the identity of the person suspected by the police. (*People v. Yeoman, supra,* 31 Cal.4th at pp. 123-124; *Ochoa, supra,* 19 Cal.4th at pp. 412-413; *People v. Slutts, supra,* 259 Cal.App.2d at p. 891.) We must look to the totality of the circumstances of the identification procedure. If we find the challenged procedure is not impermissibly suggestive, the due process claim fails. (*Ochoa, supra,* 19 Cal.4th at p. 412.)

**D. Analysis**

Defendant Easter did not file a pretrial motion to challenge the photographic identification procedure. He filed a posttrial motion for new trial based on the inherent suggestiveness of the identification procedure, and the trial court denied that motion. On appeal, however, he has not challenged the court's denial of his new trial motion.

Defendant Easter's failure to file a timely objection to alleged suggestiveness of the identification procedure results in waiver of that issue. (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) Easter acknowledges this problem and raises the alternate contention that his defense attorney was prejudicially ineffective for failing to file a

pretrial motion to challenge the single photographic show-up which led to Franco and Gaynor identifying him as the third robbery suspect.

"To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him. [Citations.]" (*People v. Hawkins* (1995) 10 Cal.4th 920, 940, overruled on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110 and *People v. Blakeley* (2000) 23 Cal.4th 82, 89.)

We first note that while Easter's attorney did not file a pretrial motion to exclude the identifications, he was not oblivious to this issue. He extensively cross-examined Detective Mares on how and why he only used a single photograph for the identification of Easter, and about his failure to use a photographic lineup. When Franco testified, Easter's attorney sought to undermine the accuracy of Franco's identification of Easter, and Franco became confused as to whether he had identified Thompson and/or Easter. Finally, Easter's attorney used closing argument to attack the reliability of the Gaynor and Franco identifications of Easter based on inconsistencies in Franco's description of the third suspect, Franco's trial confusion, and the use of a photograph with both Williams and Easter. Easter's attorney urged the jury to review the instruction about the factors to evaluate eyewitness identifications, and argued the victims' identifications of Easter were not reliable and should be rejected. The jury was fully and correctly instructed by CALCRIM No. 315 on the factors to evaluate eyewitness identification testimony.

In any event, "[i]f a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient. [Citation.]" (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, overruled on other grounds in *People v. Doolin*

61.

(2009) 45 Cal.4th 390, 421, fn. 22.) Thus, the ultimate question before this court is whether the failure of Easter's attorney to file a pretrial challenge to the identification procedure was prejudicial, i.e., whether there is a reasonable probability the result would have been different if such a motion had been made.

### 1. *Suggestiveness*

We believe the answer to that question is no for several reasons. First, the use of a single photograph is not inherently unfair or impermissibly suggestive, and the fact the officers used that procedure did not violate due process by itself.

Second, there is no evidence the investigating officers engaged in any conduct which improperly suggested to Gaynor and/or Franco that the officers believed Easter was one of the suspects. Indeed, Gaynor had looked at numerous suspects before he identified Easter. Just after the robbery, police officers drove Gaynor past two or three men standing on the street near the apartment complex and asked Gaynor if any of these men were the robbery suspects. Gaynor said no. Later that night, Gaynor was taken to an infield show-up of three men. He immediately identified Williams and Thompson as two of the robbers, but did not identify the third man as a suspect.

When Detective Mares showed Gaynor and Franco the photograph of Easter from Williams's cell phone (on separate occasions), Mares read admonitions to them that the photograph may or may not show someone involved in his case. Franco also looked at different photographic lineups. Thus, the officers' efforts to identify all three suspects were not limited to showing the single photograph of Easter to the robbery victims.

Defendant Easter argues the single photograph shown to the victims was inherently suggestive because it depicted Easter and Williams together, and Williams had already been identified as one of the robbery suspects. The People contend that Easter was the only person in the photograph that was shown to the robbery victims. In support of this contention, the People cite to the trial court's findings when it denied defendant's new trial motion.

When the trial court made these findings, however, it acknowledged that it was doing so from memory. The court's memory appears inconsistent with the trial evidence. Detective Mares testified that he showed the photograph marked exhibit No. 7 to Franco and Gaynor, the photograph had been found on Williams's cell phone, and it depicted two African-American males: Easter, who had red-tipped dreadlocks, and Williams.[32]

We note that the mere fact that Williams and Easter were in the single photograph together does not mean the identification procedures were suggestive. On the night of the robbery, Gaynor was taken to an infield show-up and asked to look at three men: Williams, Thompson, and a third man. Gaynor identified Williams and Thompson as two of the robbery suspects, and did not identify the third man. Thus, the presence of another man with two of the identified suspects did not influence Gaynor to identify that man, or cause him to hesitate about identifying the other two suspects. As for Franco, he looked at photographic lineups, which contained pictures of Thompson and Williams. He identified Thompson as the man who went through his pockets, but he failed to identify Williams. Thus, the record suggests that Franco looked at the photograph without having already identified Williams.

### 2. *Reliability*

In any event, even if it was suggestive to show the victims a single photograph, the identifications were reliable under the totality of the circumstances, considering the victims' opportunity to view the perpetrator at the time of the offense, the accuracy of their descriptions, the level of certainty they demonstrated at the time of the identifications, and the lapse of time between the robberies and the identifications.

---

[32] The court may have relied on Gaynor's testimony when it made this finding. Gaynor testified he identified Easter from a photograph which showed a single person, and he thought he looked at a photograph other than exhibit No. 7 when he made the identification. Gaynor also testified that at some point, he looked at exhibit No. 7 and recognized both Williams and Easter in the picture.

(*People v. Kennedy* (2005) 36 Cal.4th 595, 608 (*Kennedy*), disapproved on other ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)  Both Gaynor and Franco were in close proximity with all three robbers, they consistently described the third man's red-tipped dreadlocks, Gaynor made his identification less than 24 hours after he was robbed, and Franco's identification was within two to three days after he was robbed.  Franco and Gaynor both said they were certain of their identifications at the time they viewed the photograph, and Franco further identified Easter as the gunman in his robbery.  While Franco and Gaynor may have been shaken by being victims of an armed robbery, they were sufficiently observant to also identify the white T-Mobile cell phone as the device which Williams held during the robberies, and describe the firearm consistent with the weapon which was found in the apartment with the stolen cell phones.

Defendant Easter argues the victims' identifications were not reliable because they gave inconsistent descriptions of the third suspect's precise height, and whether he had gold or silver teeth.  Easter also points out that during his trial testimony, Franco confused Easter with Thompson, and he did not identify Easter at trial as the third suspect.

There are two cases which dealt with similar issues about suggestiveness and reliability.  In *Kennedy, supra,* 36 Cal.4th 595, a seemingly suggestive identification process was found to be reliable under similar circumstances.  In that case, a witness to a murder at a rest stop described the perpetrator to police and attempted to aid in preparing a composite sketch of the man.  (*Id.* at p. 603.)  She said the perpetrator had no facial hair.  (*Ibid.*)  When an arrest was made, the witness saw a newspaper photograph of the arrestee, the defendant, and expressed her concern to police because of the defendant's eyes and beard.  (*Id.* at pp. 605, 610.)  A detective showed her a picture of the defendant without a shirt, which revealed his tattoos of a swastika, a gun, and the name of his gang.  The witness could not identify the defendant because his eyes were downcast in the picture.  When shown a videotape of the arrest, however, the witness saw the defendant's

eyes, immediately identified him, and expressed disbelief for failing to notice his beard. The witness later positively identified the defendant at trial. (*Ibid.*) The trial court found the identification procedure was not unduly suggestive.

*Kennedy* held the identification evidence "was admissible as reliable under the totality of circumstances .…" (*Kennedy, supra,* 36 Cal.4th at p. 610.) *Kennedy* found that the facts that the witness had inaccurately described the suspect to police, and did not recognize him in the newspaper photograph, were outweighed by her proximity to the perpetrator, she had looked at him for 30 to 60 seconds, only three weeks passed between the crime and the identification, and the certainty of her later identifications upon seeing the video and in court. (*Id.* at pp. 610-611.)

In *People v. Contreras, supra,* 17 Cal.App.4th 813, the court held that a prosecutor's act of showing a single photograph of the defendant to a victim witness was suggestive, but the identification did not violate due process. (*Id.* at p. 820.) The victim had been told there were two suspects in custody. The victim personally knew one of his attackers, and he knew the police wanted him to identify the other one. *Contreras* held the showing of the single photograph necessarily suggested to the witness that it depicted the other attacker. (*Ibid.*)

However, *Contreras* further held that the trial court's decision to allow the identification evidence did not violate due process. (*Contreras*, *supra*, 17 Cal.App.4th at p. 823.) The jury was made fully aware of the witness's failure to select the defendant from photographic lineups prior to the identification at the preliminary hearing. (*Ibid.*) The jury saw the single photograph of the defendant and was able to assess its clarity. The jury was also able to determine whether the witness should have been able to identify the defendant given the circumstances of the attack, it was instructed on the factors bearing upon the accuracy of an eyewitness's identification, and defense counsel strenuously argued that the identification was not credible. At that point, the

identification issue became "largely one of credibility," which was a question for the jury. (*Id*. at pp. 823-824.)

In this case, as in *Kennedy* and *Contreras*, the jury was well aware of the single photograph identification procedure. Easter's attorney ably developed the evidence which showed the procedures used to identify Easter, the nature of the photograph used for that identification, Franco's confusion at trial between Easter and Thompson, and the possible differences between the victims' descriptions of the third suspect and Easter's appearance. The jury was also fully instructed on the factors to evaluate eyewitness identification testimony, and defense counsel urged the jury to discount the victims' identifications of Easter as inaccurate.

Easter cites *People v. Nation* (1980) 26 Cal.3d 169, as an example where a defense attorney's failure to challenge the identification procedure was prejudicial. The instant case, however, is not similar to *Nation*. In *Nation*, the defendant was charged with threatening and molesting children. Two weeks after the event, the children viewed photographs at the police station. One child selected the defendant's mug shot. She told the other children that she had identified the assailant, and, after some discussion, the other children agreed. An officer gave the mug shot to the children, so they could take it home and show other possible witnesses. Almost four months later, the children failed to identify the defendant in a live lineup, and they identified another individual. They were told they had selected the "wrong" man. (*Id.* at p. 174.)

*Nation* held that the photographic identification evidence was so extraordinarily suggestive that it was doubtful that the prosecutor could have submitted it over the timely objection of trial counsel. *Nation* further held defense counsel's failure to object to the identification procedure deprived defendant of constitutionally adequate assistance. (*People v. Nation, supra,* 26 Cal.3d at pp. 174, 179-181.) As illustrated, *ante*, such suggestive and unreliable circumstances are completely absent from this case.

### 3. *Prejudice*

Finally, given the nature of defendant's ineffective assistance claim, the record demonstrates another reason that it is not reasonably probable that a more favorable result would have occurred. Defendant Easter contends defense counsel's conduct was prejudicial because there was no other evidence which implicated him in the robberies, aside from the victims' identification testimony, and Thompson's trial testimony which exonerated him.

The entirety of Thompson's trial testimony cannot be characterized as exonerating Easter. Thompson testified that he committed two of the robberies with Williams, and Easter was not the third person. Thompson initially claimed that the third suspect in the Franco robbery was not the same person who committed the Gaynor robbery. He said he met both these men at the apartment complex. One man was associated with the Crips; he did not really know these men; and he feared for his life if he identified them.

On cross-examination, however, Thompson's description of two different men as the third suspect began to break down. Thompson admitted that the same man committed both the Gaynor and Franco robberies, but still refused to identify him. When asked why he was willing to implicate Williams, Thompson replied that he knew Williams had already talked to the police and admitted he committed the robberies.

The most crucial part of Thompson's testimony was his admission that he knew that Easter had not implicated himself in any of the robberies. Thompson testified he was afraid to implicate Easter as the third suspect because Easter had not implicated himself.

> "Q    So isn't it true that you're afraid that if you were to say that Brian Easter was the person, the third party involved in this robbery that you would be implicating him where he hadn't previously done so?
>
> "[EASTER'S ATTORNEY]:    I'm going to object to the form of the question as argumentative, compound, and vague.
>
> "THE COURT:    Overruled.

67.

"[THOMPSON]:     Can you say it one more time for me?

"(Thereupon the question was read by the court reporter.)

"[THOMPSON]:     Yes."

Thompson insisted that was not the reason that he said the third suspect was someone other than Easter.  However, Thompson also testified he was related to Easter.  Thompson had known Easter for his entire life, and he did not want Easter to get into trouble.  Thompson denied that he would lie for Easter.

While Thompson may have claimed Easter was not the third suspect, and he would not lie for Easter, he conceded he was afraid to implicate someone who had not already confessed to the crimes.  Thompson's testimony thus raised the extremely strong inference that Easter was the third robbery suspect.

We thus conclude that based on the entirety of the record, defense counsel's failure to challenge the pretrial identification of Easter was not prejudicial because the victims' identifications were otherwise reliable, and any erroneous admission of their identifications was harmless given Thompson's trial testimony.

## VII.     Admissibility of Williams's postarrest statements about Thompson

Easter raises another ineffective assistance argument based on defense counsel's efforts to introduce Williams's postarrest statement that he committed the robberies with Thompson.  The court allowed evidence that Williams did not identify Easter as a suspect, and claimed the gunman was named "Alex" or "A-1."  However, the court excluded that portion of Williams's statement when he said that he committed the robberies with Thompson, since Williams did not testify and the evidence violated the *Aranda/Bruton* rule.  Thompson later testified at trial and admitted he committed the robberies.

On appeal, Easter contends his defense attorney should have renewed his motion to introduce the portion of Williams's statement which implicated Thompson, once Thompson testified and admitted his guilt.  Easter argues that Thompson's trial testimony

eliminated any *Aranda/Bruton* problem. Easter further argues the entirety of Williams's statement would have demonstrated his credibility when Williams did not identify Easter as a suspect, since he admitted his own guilt, identified Thompson, and Thompson later testified and admitted he committed the robberies.

### A. Williams's postarrest statement

As explained in the factual statement, *ante*, Williams and Thompson were arrested shortly after the Gaynor robbery. Detective Mares interviewed Williams after he was arrested. Williams admitted he committed the Gaynor, Flechsing, and Franco robberies. Williams said he committed the robberies with Thompson. Williams said the gunman during the Franco robbery was named "Alex" or "A-1." Williams did not identify Easter as the gunman or a suspect.

Neither Thompson nor Easter gave statements or implicated themselves prior to trial.

### B. Easter's pretrial motions about Williams's statement

During pretrial motions for the joint jury trial, Easter's attorney moved for severance of all the charges against Easter from that of Thompson and Williams. The court denied the motion because Easter failed to show prejudice from a joint trial.

As pretrial motions continued, the prosecutor stated that he would call Detective Mares to testify about Williams's postarrest confession, and exclude the portion which implicated Thompson and exonerated Easter because those statements were inadmissible.

Easter's attorney objected because he wanted to introduce the entirety of Williams's statement, particularly Williams's identification of someone else as the gunman, and his failure to name Easter as a suspect. Thompson's attorney objected to Easter's motion, and argued the entirety of Williams's statement violated Thompson's rights under *Aranda/Bruton*.

Easter's attorney acknowledged there were *Aranda/Bruton* issues as to Thompson, but argued such issues would be eliminated if the court granted his motion to sever

69.

Easter's trial from the other two defendants. Easter's attorney argued the entirety of Williams's statement was credible because he implicated himself and another person while failing to name Easter. Easter's attorney renewed his motion for severance so that the entirety of Williams's statement could be admitted.

The court excluded that portion of Williams's statement which implicated Thompson pursuant to the *Aranda/Bruton* rule, unless Williams testified. The court granted Easter's motion that he could ask Detective Mares if Williams implicated a third party named "Alex" and not Easter, as long as Thompson was not mentioned. The court denied Easter's motion for severance because of "the very strong policy issues in favor of nonseverance, given the interrelatedness of the allegations and frankly the evidence .…"

### C. Easter's motion for new trial

In his motion for new trial, Easter argued the trial court committed prejudicial error when it denied his motion to sever his trial from Thompson and Williams. Easter again argued that the entirety of Williams's statement was crucial to Easter's defense since he failed to identify Easter, had implicated Thompson, and Thompson admitted his guilt, and severance should have been granted to avoid the *Aranda/Bruton* issues as to Thompson.

In opposition, the People argued Easter did not suffer prejudice from the consolidated trial because Williams's statement was not cross-admissible, a weak case was not joined with a strong case, defendants were charged with the same crimes, and the charges were not inflammatory as to Easter compared to the other two defendants. The People also noted that the jury heard evidence that Williams exonerated Easter from committing the robberies, and identified the gunman as "Alex" or "A-1."

The court denied Easter's new trial motion.

### D. Analysis

On appeal, Easter has not challenged the trial court's denial of his motion to sever his jury trial from that of Williams and Thompson; the trial court's initial ruling that

70.

Williams's statements about Thompson were inadmissible in this joint trial because of the *Aranda/Bruton* rule; or whether the court improperly denied his new trial motion based on these issues.

Instead, Easter contends his defense attorney was prejudicially ineffective because once Thompson testified and admitted he committed the robberies, counsel should have renewed his motion to admit the portion of Williams's statement when he implicated Thompson, since the *Aranda/Bruton* problem was no longer an issue after Thompson's admissions. Easter argues that Williams's failure to name Easter as one of the robbers, and his identification of "Alex" as the gunman, would have been more credible if the jury heard Williams's implication of Thompson, in light of Thompson's trial admission of guilt.

As explained, *ante*, the *Aranda/Bruton* rule "declares that a nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given. [Citation.]" (*People v. Anderson, supra,* 43 Cal.3d at p. 1120.)

Easter concedes that Williams's implication of Thompson was inadmissible under *Aranda/Bruton*. Easter also concedes the jury heard Detective Mares's testimony that Williams confessed his guilt for the three robberies, did not identify Easter as a suspect, and said the gunman in the Franco robbery was named "Alex" or "A-1." However, Easter insists the court would have granted a renewed motion to introduce the entirety of Williams's postarrest statement once Thompson testified and eliminated the *Aranda/Bruton* issue.

### 1. *Chambers*

In making this argument, Easter also concedes that Williams's statements about Thompson's guilt still would have constituted inadmissible hearsay since Williams did not testify at trial, and there was no applicable hearsay exception to permit the

71.

introduction of this evidence. However, Easter argues that Williams's statements were nonetheless reliable and crucial to establish his innocence, and should have been admitted pursuant to *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*) to preserve his due process right to present a defense, despite the hearsay problems.

In *Chambers,* a defendant in a murder trial called a man as a witness who had previously confessed to the murder. (*Chambers*, *supra*, 410 U.S. at p. 294.) After the witness repudiated his confession on the stand, the defendant was denied permission to examine the witness as an adverse witness based on Mississippi's " 'voucher' rule" which barred parties from impeaching their own witnesses. (*Id.* at pp. 294-295.) In addition, Mississippi did not recognize an exception to the hearsay rule for statements made against penal interests, thus preventing the defendant from introducing evidence that the witness had made self-incriminating statements to three other people. (*Id.* at pp. 297-299.) The United States Supreme Court noted that the State of Mississippi had not attempted to defend or explain the rationale for the voucher rule. (*Ibid.*) The court held that "the exclusion of this critical evidence, coupled with the State's refusal to permit [the defendant] to cross-examine [the witness], denied him a trial in accord with traditional and fundamental standards of due process." (*Id.* at p. 302.)

In *People v. Ayala* (2000) 23 Cal.4th 225 (*Ayala*), the California Supreme Court considered whether the defendant "had either a constitutional or a state law right to present exculpatory but unreliable hearsay evidence that is not admissible under any statutory exception to the hearsay rule." (*Id*. at p. 266.) The defendant relied on *Chambers* and argued the trial court had "infringed on various constitutional guaranties when it barred the jury from hearing potentially exculpatory evidence." (*Id*. at p. 269.)

*Ayala* rejected the defendant's argument and held that " '[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense. [Citations.] [But in] the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and

72.

reliability in the ascertainment of guilt and innocence.' [Citation.] Thus, '[a] defendant does not have a constitutional right to the admission of unreliable hearsay statements.' [Citations.] Moreover, both we [citation] and the United States Supreme Court [citation] have explained that *Chambers* is closely tied to the facts and the Mississippi evidence law that it considered. *Chambers* is not authority for the result defendant urges here." (*Ibid.*)

Indeed, the United States Supreme Court has clarified that *Chambers* "does not stand for the proposition that the defendant is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence." (*U.S. v. Scheffer* (1998) 523 U.S. 303, 316.) The California Supreme Court has similarly held " '[t]he same lack of reliability that makes ... statements excludable under state law makes them excludable under the federal Constitution.' [Citations.]" (*People v. Butler* (2009) 46 Cal.4th 847, 867.)

Easter argues that Williams's postarrest statements about Thompson and Easter were reliable and admissible under *Chambers*, because Williams also implicated himself and Thompson later admitted his guilt. However, there are several factors which undermine the reliability of Williams's failure to identify Easter, based upon facts which were known to Williams when he gave this statement. Williams and Thompson were apprehended in the apartment of Thompson's grandmother a short time after Gaynor was robbed. Williams knew the police searched the apartment, which contained the Xbox, videogames, and identification stolen from Flechsing earlier that day; the two cell phones stolen from Gaynor shortly before the search; and the firearm which was used for all three robberies. Williams and Thompson were asked to stand outside while someone identified them, and they were both arrested.

Based on these circumstances, Williams knew that Thompson had been identified and arrested, and the stolen property was found in his grandmother's apartment. Thus, Williams did not implicate Thompson in a vacuum. Williams also knew Easter was not in the apartment and had not been arrested with them. However, Williams's own cell

73.

phone was found hidden in the same location as the stolen cell phones and the gun. Williams likely realized there were images on his cell phone which showed Easter posing with Williams and Thompson in that same apartment, while Thompson displayed the gun used in the robberies.[33] These factors thus seriously undermine the reliability of Williams's postarrest failure to identify Easter, his high school friend, as one of the suspects, and his identification of "Alex" or "A-1" as the third suspect. Defense counsel's failure to renew his motion to admit the entirety of Williams's statement was not prejudicial because Williams's statements were not admissible since they were made under circumstances suggesting they were not reliable. (*Ayala*, *supra*, 23 Cal.4th at p. 270.)

## VIII.  Denial of Easter's motion to reopen

Easter contends the court committed prejudicial error when it denied his motion to reopen his defense case to call a purported alibi and character witness. Easter argues that he should have been allowed to reopen to call rebuttal witnesses, based on the nature of Easter's trial testimony.

### A.  Easter's trial testimony

As set forth in the factual statement, Easter testified at trial and denied committing the robberies. Easter testified that on the night of the Gaynor robbery, he was staying at the residence of his child and the child's mother. Easter testified he had never committed a crime.

---

[33] The record contains circumstantial evidence that Williams was well aware of the images on his cell phone. The photographs on Williams's cell phone which show Williams and Easter (exhibit No. 7), and Williams, Easter, and Thompson (exhibit No. 3), were taken while defendants posed in a mirror as Williams himself held up his white cell phone and recorded the same images.

After Easter completed his testimony, the court asked his attorney whether he had any further witnesses. Easter's attorney said no. The court asked the other two defense attorneys and the prosecutor if they had further evidence, and they said no.

## B. The instructional conference

After the parties rested, the court excused the jury and conducted the instructional conference. Easter's attorney asked the court to give CALCRIM Nos. 350 and 351, on the jury's consideration of favorable traits of the defendant's character, based on Easter's testimony that he had never committed a crime. The prosecutor objected and argued such testimony was not character evidence.

Defense counsel responded that if the court decided not to give the instruction, then he would move to reopen to call Carlisa Daily, the mother of Easter's child, as a character witness. The prosecutor objected because the request was untimely, there was no discovery or offer of proof, and he had never heard this witness's name. Easter's attorney replied that Daily would be a rebuttal witness.

Easter's attorney advised the court that Daily had been seated in the courtroom during Easter's testimony. The prosecutor again objected. Defense counsel explained that Daily had not been considered a witness until after Easter's testimony. The court deferred ruling on the matter, and the parties continued to address the instructions.

## C. Easter's motion to reopen

After the lunch recess, Easter's attorney stated that Daily was present in the courtroom and was ready to testify. Easter moved to reopen the defense case so she could testify about Easter's character for peacefulness or nonviolence. The prosecutor objected because the defense failed to provide any discovery, which left him unable to prepare for further rebuttal. Easter's attorney made an offer of proof, that Daily would testify that she had known Easter since 2006, they had a child together, and she had never seen or heard of him acting violently.

The court interrupted defense counsel and asked Daily to step outside the courtroom. The court then said it was concerned that Daily "has been in and out of the court for some time throughout the trial, including this morning when Mr. Easter testified."

Defense counsel replied the alibi issue did not arise until cross-examination, when the prosecutor asked Easter where he was on the night of the robberies, and counsel had thought Easter's testimony was sufficient for the character evidence instruction. Defense counsel conceded his request to call Daily had not been timely, but argued her testimony was relevant as rebuttal evidence because of the prosecutor's questions about Easter's whereabouts on the night of the robberies.

The prosecutor stated that he did not know Daily's identity and had no idea she was in the courtroom during Easter's testimony. The prosecutor argued it was not appropriate for Daily "to watch the testimony of Easter and then testify as an alibi witness to exactly what she observed on the witness stand. That is the purpose for excluding witnesses. And frankly, I was not in the position to know that she was in the courtroom."

### D. **The court's denial of the motion**

The court denied Easter's motion to reopen and call Daily as a witness.

> "The Court believes the timing of the request to call this witness as a character witness is very significant. Again, it was done after everyone had announced that they had rested, it was after the People had raised these issues that everyone was aware of.… The issue is that this is a potential witness who was present during the testimony of the witness about whom the person is going to be giving evidence. This witness was not made known to the People until … after we excused the jurors for the noon recess. It was only after the Court indicated that it would not be giving [the defense character instructions].… And the Court does not see what amounts to character evidence.

> "The Court believes at this point the request was untimely, that it is something that could have and should have been raised earlier, that it could

76.

involve the Court in a much longer examination. For example, if this witness were to testify that, as was pointed out on the offer of proof, that she has not known Mr. Easter to ever be involved in violent conduct, the question then remains whether she saw the video [from Williams's cell phone] and whether there's conduct in that video which may suggest otherwise. And, again, that involves the jurors seeing the video yet again, and that can raise other issues."

The court further found the probative value of Daily's testimony was substantially outweighed by undue consumption of time and confusion of issues.

**E. Analysis**

"We review for abuse of discretion a trial court's ruling on a motion to reopen a criminal case to permit the introduction of additional evidence. [Citations.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 836.) "In determining whether a trial court has abused its discretion in denying a defense request to reopen, the reviewing court considers the following factors: '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.' [Citation.]" (*People v. Jones* (2003) 30 Cal.4th 1084, 1110.)

The trial court "may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses." (Evid. Code, § 777, subd. (a).) "The courts of this state have consistently held that the violation of a witness exclusion order [citations] does not render the witness incompetent to testify, and does not furnish grounds to refuse permission to testify, at least where the party who seeks to offer the testimony was not 'at fault' in causing the witness's violation of the exclusion order. [Citations.]" (*People v. Redondo* (1988) 203 Cal.App.3d 647, 654; *People v. Adams* (1993) 19 Cal.App.4th 412, 436.)

In this situation, the court ordered all witnesses excluded, but Daily was never identified as a witness. However, Daily's existence was obviously well-known to Easter;

she did not suddenly appear as a surprise witness at the close of the defense case. When he moved to reopen, Easter's attorney never stated that he did not know about Daily's existence, or that she could provide Easter's alibi for the night of the Gaynor robbery. Instead, defense counsel argued that he did not believe Daily's testimony was going to be relevant until the court declined to give the character evidence instructions for the defense. More importantly, both the court and the prosecutor were apparently unaware of Daily's identity, appearance, or presence in the courtroom during the entirety of the trial, and particularly during Easter's trial testimony. Defense counsel never challenged the factual accuracy of their comments on this point. For these reasons, the trial court did not abuse its discretion when it denied Easter's motion to reopen and call Daily.[34]

## DISPOSITION

The judgment is affirmed.

_____
Poochigian, J.

WE CONCUR:

_____
Gomes, Acting P.J.

_____
Detjen, J.

---

[34] Given our resolution of all the issues raised by the defendants, we further find there were no cumulative errors.